FÉLIX M. DÁVILA VEGA y OTROS, demandantes y recurridos, *v.* RITA AGRAIT VDA. DE DÁVILA y OTROS, demandados y recurrentes.

*Número:* R-84-24 *Resuelto:* 1ro de octubre de 1985

*Elizabeth Álvarez de Barbosa,* abogada de los recurrentes; *Edda Dávila Agrait, Edda Surface Dávila* y *Rita I. Surface Dávila, Andrés Díaz Nieves,* abogados de los recurridos Félix M. Dávila Vega y Emer Dávila Vega.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Plantea este recurso cuestiones medulares en torno a la ley puertorriqueña de fideicomiso. Para concretar la naturaleza, alcance y contenido de esa figura jurídica —y su impacto sobre nuestro régimen de Derecho hereditario— es necesario reexaminar nuestro cuerpo de ley desde una justa perspectiva histórica.

## I

El 3 de enero de 1964 Sergio Dávila Declet y sus hijas Edda Dávila Agrait y Wanda Dávila Agrait otorgaron una escritura de "fideicomiso". En lo pertinente expresaron:

> PRIMERO: Que el DONANTE en esta fecha ha hecho las siguientes donaciones de acciones comunes de HERMANAS DAVILA, INC., (denominada la CORPORACION), de un valor a la par de CIEN DOLARES ($100.00), a saber:
>
> (1) A su nieta RITA ILEANA SURFACE DAVILA, de diez (10) años de edad, CUATROCIENTOS VEINTE Y SEIS (426) ACCIONES de la CORPORACION;
>
> (2) A su nieta EDDA DEL CARMEN SURFACE DAVILA, de nueve (9) años de edad, CUATROCIENTOS VEINTE Y SEIS (426) ACCIONES de la CORPORACION;
>
> (3) A su nieta WANDA LILI SEVILLANO DAVILA, de nueve (9) años de edad, TRESCIENTOS DIEZ Y OCHO (318) ACCIONES de la CORPORACION;
>
> (4) A su nieto HECTOR SERGIO SEVILLANO DAVILA, de siete (7) años de edad, TRESCIENTOS DIEZ Y OCHO (318) ACCIONES de la CORPORACION;
>
> (5) A su nieto SERGIO MARCOS SEVILLANO DAVILA, de cuatro (4) años de edad, TRESCIENTOS DIEZ Y OCHO (318) ACCIONES de la CORPORACION. Ap. III, págs. 8–9.

Inmediatamente el proponente procedió a delimitar el alcance del desprendimiento patrimonial:

SEGUNDO: Que el DONANTE ha donado dichas acciones a sus mencionados nietos sujetas al fideicomiso que por la presente se crea mediante las siguientes cláusulas. . . . Ap. III, pág. 9.

A tal efecto, como fiduciario consignó que retenía todos los poderes de accionista, incluso el derecho al voto y a consentir a cualquier acto de la corporación o de los accionistas y a recibir dividendos cuando fuesen pagados en acciones, sujetos los mismos a los efectos del fideicomiso constituido. Los dividendos en efectivo serían pagaderos a sus nietos en calidad de beneficiarios. Dispuso que el fideicomiso terminaría el último día de diciembre de 1978.

En caso de su fallecimiento, incapacidad o ausencia, actuaría como fiduciaria de sus nietas Rita Ileana y Edda del Carmen Surface Dávila, su madre Edda. De los restantes nietos Wanda Lili, Héctor Sergio y Sergio Marcos, lo sería su madre Wanda.

En el 1976, Sergio Dávila Declet, murió intestado. Sus herederos, presentaron demanda de división de bienes hereditarios ante el Tribunal Superior, Sala de Bayamón (Civil Núm. 77-1295). El presente recurso tiene su génesis en un incidente en ese procedimiento que aún pende en dicho foro. El 16 de septiembre de 1983, Félix Dávila Vega y Emer Dávila Vega, demandantes, mediante solicitud de sentencia sumaria impugnaron la validez de las "donaciones" relacionadas. Alegaron que semejante traspaso realmente nunca se efectuó y que "fu[e] nulo e inexistente por disposición de Ley". En apoyo invocaron el Art. 846 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2553 (¹) y lo resuelto en *Vda. de*

---

(¹) Reza:

"Quedan prohibidos y son igualmente nulos los fideicomisos constituidos con perjuicio o menoscabo de la legítima correspondiente a herederos forzosos, según lo preceptuado en este título."

*Fuxá* v. *Torres Aguilar*, 85 D.P.R. 285 (1962). En oposición, los demandados argumentan la existencia de una controversia real sobre hechos esenciales; que hasta la fecha no se había determinado el caudal relicto del causante, y que debía entenderse que el fideicomiso era aplicable o reputable al tercio de libre disposición.

El tribunal de instancia acogió el planteamiento de nulidad. Decretó su ineficacia bajo el siguiente razonamiento:

1. "Asumiendo que la donación fuera un acto separado al de la constitución del fideicomiso, entonces sería nula aquélla por ser verbal y no mediar la entrega de la cosa." 31 L.P.R.A. sec. 2009.

2. "Si se asume, por el contrario, que el documento de fideicomiso es a su vez el documento escrito de donación, también resulta ésta ineficaz por carecer de la aceptación por escrito de la donación." 31 L.P.R.A. sec. 2009.

3. "Milita también en contra de la parte promovida el Art. 846 del Código Civil, antes mencionado." 31 L.P.R.A. sec. 2553. Se aduce que las donaciones fueron "considerables" y que por no ser todas colacionables siempre perjudicarían la participación de los herederos. Se descarta el planteamiento de que el fideicomiso pudiera ser imputado al tercio de libre disposición porque "sólo por testamento puede disponerse de ese tercio libre". Ap. III, págs. 5–6.

Posteriormente, dictó sentencia parcial y ordenó la restitución de las acciones donadas, para integrarlas y formar parte del caudal relicto a distribuirse entre los herederos del causante Sergio Dávila. Acordamos revisar.

## II

El fideicomiso puertorriqueño es una institución con caracteres particulares que incorpora los principios del *trust* anglosajón e intenta armonizarlos con nuestra tradición civilista. *Álvarez* v. *Sec. Hacienda*, 78 D.P.R. 412, 419–420 (1955), en reconsideración, 80 D.P.R. 16, 21, 35–41 (1957).

Al remontarnos al origen de la ley, encontramos que la misma es una adaptación de la ley de fideicomiso de Panamá del año 1925, [2] redactada por el Dr. Ricardo J. Alfaro y promovida en nuestro suelo por el Lic. Miguel Guerra Mondragón, autor del proyecto que luego se convertiría en la Ley de Fideicomiso de Puerto Rico. [3] *Belaval* v. *Tribl. de Expropiaciones*, 71 D.P.R. 265, 271 (1950); L. F. Sánchez Vilella, *The Problems of Trust Legislation in Civil Law Jurisdictions: The Law of Trusts in Puerto Rico*, 19 Tul. L. Rev. 374 (1945); R. G. Patton, *Trust Systems in the Western Hemisphere*, 19 Tul. L. Rev. 398 (1945); R. G. Patton, *El Futuro de la Legislación de Fideicomiso*, 17 Rev. Jur. U.P.R. 221 (1948). Las vicisitudes que generó su caracterización y desarrollo han sido objeto de riguroso estudio. L. F. Sánchez Vilella, *El Fideicomiso Puertorriqueño I*, 25 Rev. C. Abog. P. R. 293 (1965); *El Fideicomiso Puertorriqueño II*, 25 Rev. C. Abog. P. R. 313 (1965); *El Fideicomiso Puertorriqueño III*, 37 Rev. C. Abog. P. R. 417 (1976); *El Fideicomiso Puertorriqueño IV*, 37 Rev. C. Abog. P. R. 453 (1976); *El Fideicomiso Puertorriqueño V*, 38 Rev. C. Abog. P. R. 159 (1977).

■ La etimología de fideicomiso deriva de las voces latinas *fides*, fe o confianza y *comitere*, encomendar: de lo que resulta que viene a ser un encargo o comisión de confianza. R. J. Alfaro, *Adaptación del trust del Derecho anglosajón al Derecho civil*, La Habana, Acad. Interam. de Der. Comp. e Inter., 1948, págs. 55–56. Se recoge esta figura jurídica por analogía en diversos sistemas de Derecho. Aparece la fidu-

---

[2] Debe señalarse, no obstante, que el ordenamiento jurídico panameño, aunque también de sello civilista, es diferente al nuestro en cuanto al régimen sucesoral, ya que, por ejemplo, allá no se reconocen las legítimas. L. F. Sánchez Vilella, *Anteproyecto sobre un Código de fideicomisos para Puerto Rico*, 1976, pág. 2. (Biblioteca del Tribunal Supremo.)

[3] Ley Núm. 41 de 1928, Art. 834 del Código Civil, 31 L.P.R.A. sec. 2541.

cia (⁴) "como una de las más antiguas formas del derecho romano de obligaciones para el pago de deudas". El *pactum fiduciae* era en aquel tiempo un contrato por el cual el acreedor fiduciario recibía la propiedad de una cosa perteneciente al deudor en garantía del cumplimiento de una obligación, la cual debía restituir llegado el caso convenido. Se entrelaza, pues, con la prenda en su concepto originario. P. Claret Martí, *De la fiducia y del "trust"*, Barcelona, Ed. Bosch, 1946, págs. 8 y 9; R. Von Mayr, *Historia del Derecho Romano* (W. Roces, traductor), 2da ed., Barcelona, Ed. Labor, 1931, Vol. I, pág. 203 y ss., y Von Mayr, *op. cit.*, Vol. II, pág. 108 y ss. Pero su naturaleza tuvo expansión al tamiz de las restricciones en materia sucesoria. Así en la Roma Antigua cuando el testador interesaba dejar herencia a una persona incapacitada para heredar, se valía del "fideicomiso", una relación de confianza con una persona que habría de ser titular de la herencia de manera provisional y transitoria —fiduciario— y que luego debía entregar al heredero en cuestión tan pronto las circunstancias se lo permitieran. E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. II, pág. 555; Claret, *op. cit.*, pág. 11.

Su dimensión como un acto de última voluntad *extra ordinem* y reconocimiento jurídico, ya proclamado en las instituciones de Justiniano, datan del tiempo de Augusto. A. Ortega Carrillo de Albornoz, *Observaciones sobre el fideicomiso de libertad, libro homenaje a Ramón M. Roca Sastre*, Madrid, Gráficas Cóndor, 1976, Vol. 1, pág. 189. No había acción judicial para hacer efectivo el fideicomiso. Tampoco era indispensable que se hiciese testamento para su constitución. Pero, en

---

(⁴) Para efectos de una comprensión cabal de la materia estudiada, adviértase que la voz "fiducia" alude en su vertiente civilista al concepto de fideicomiso originado en el Derecho antiguo romano, mientras que la alusión al concepto de *trust* refiere a la versión del Derecho común de naturaleza jurídica distinta. Véase L. F. Sánchez Vilella, *The Problems of Trust Legislation in Civil Law Jurisdictions: The Law of Trusts in Puerto Rico*, 19 Tul. L. Rev. 374, 381–388 (1945).

un momento dado esta institución llegó a ser tan popular que fue necesario crear el *praetor fidei-commissarius*, cuyas funciones eran las de decidir las controversias relativas a los fideicomisos. Alfaro, *op. cit.*, págs. 20–21; Claret, *op. cit.*, págs. 11 y 12. El fideicomiso clásico romano evolucionó hasta llegar a ser la moderna sustitución fideicomisaria, en la cual el fiduciario dejó de ser un mero intermediario para convertirse en el verdadero titular de los bienes, en heredero. González Tejera, *op. cit.*, pág. 555. El Código Civil español no emplea en ninguna parte la palabra fideicomiso en su acepción pura y simple limitando el alcance del significado de la sustitución al establecimiento de un orden de sucesión. ([5])

De otra parte, sostiene la doctrina moderna anglosajona que el origen del *trust* no deriva de institución civilista alguna, refiriendo su entronque con la institución del *salman* o el *treuhand* germánico. 1 A. Scott, *The Law of Trusts* Sec. 1.9 (3ra ed. 1967). En la Ley Sálica de los francos salicios del siglo V, se aludía a una persona misteriosa que luego se llamaría así *salmannus, the saleman;* una tercera persona que era llamada para ayudar a completar la transferencia de la propiedad en algunos casos. El donante le entregaba un báculo simbólico el cual a su vez traspasaría a su debido tiempo y en forma solemne al donatario. O. Wendell Holmes, *Law in Science and Science in Law*, 12 Harv. L. Rev. 443, 445–446 (1899); A. Nussbaum, *Sociological and Comparative Aspects of the Trust*, 38 Colum. L. Rev. 408, 414–415 (1938).

En una etapa avanzada de evolución, el *trust* anglosajón es sucesor inmediato del uso (*use*). 1 Scott, *op. cit.*, Secs. 1.3–1.6, págs. 13–20. El concepto de latifundios en Inglaterra había degenerado en una extraordinaria acumulación de tierras. Esa situación provocó la aprobación de leyes para impedir el traspaso de fincas a entidades, particularmente eclesiásticas, que las acaparaban. La ley de "manos muertas" constituyó la

---

([5]) En el presente, el Art. 781 del Código Civil español.

primera respuesta formal al problema. Dispuso que eran nulas las enajenaciones de tierras a favor de corporaciones eclesiásticas o de cualquier otro género. Alfaro, *op. cit.*, pág. 27; Claret, *op. cit.*, págs. 7 y 34. Entonces estas entidades adoptaron un plan para evadir tales restricciones: el traspaso era hecho a un tercero denominado "feudatario de uso" quien debía poseerlas para uso de las corporaciones. La ley de usos de 1536 aprobada en tiempos de Enrique VIII pretendió remediar esta situación. Preceptuaba que quien gozara el uso debía ser considerado como propietario de pleno derecho. Esto impedía el traspaso de tierras a beneficio de las corporaciones toda vez que dicha transacción era nula conforme a la ley de las "manos muertas". González Tejera, *op. cit.*, pág. 556. Posteriormente, los tribunales de equidad interpretaron la ley de usos, creando por excepción "un uso no comprendido entre las prohibiciones de la ley" (*use limited upon a use*), el cual advino con el nombre de *trust*. Alfaro, *op. cit.*, pág. 27.

Se destaca el origen del fideicomiso anglosajón como uno de raíz jurisprudencial (las cortes de equidad), a pesar de que con el devenir del tiempo sobrevino algún tipo de regulación por la vía estatutaria. Las colonias americanas en su contacto temprano con dicha figura aportaron significativamente en el área del fideicomiso corporativo y además introdujeron la modalidad de retribución al fiduciario en concepto de compensación por su labor. Para un historial más completo, véase 1 Scott, *op. cit.*, Secs. 1–1.11, págs. 3–32.

El fideicomiso anglosajón sobrevivió y alcanzó un notable desarrollo motivado por su gran flexibilidad y extensión, situación que propiciaba facilidades excepcionales a un sinnúmero de transacciones comerciales y civiles. Sus horizontes son amplísimos:

> . . . Puede ser constituído por testamento o por acto entre vivos; por escrito y aun verbalmente; puede tener efecto durante la vida del fideicomitente o después de su muerte; puede recaer sobre bienes muebles o sobre inmuebles, corpóreos o incorpóreos; puede ser secreto o manifiesto; públi-

co o privado; presuntivo o expreso; puede constituirse por un tiempo determinado o por toda la vida del fideicomitente o del fideicomisario o bien ser perpetuo para ciertos fines de carácter permanente (*charitable trusts*) ; puede tener como fin simplemente la conservación de determinadas propiedades o bien su manejo, inversión, administración o enajenación; *puede recaer sobre bienes de una dote, donación, herencia, legado, usufructo, sociedad comercial o concurso de acreedores o sobre bienes de cualquiera otra clase.* Y sobre una gran variedad de formas y de fines el *trust* posee la ventaja preciosa de estar sometido a la jurisdicción de *Equidad,* mediante la cual los tribunales, sin sujeción a los rigorismos del derecho común y poniendo en práctica admirables principios que se adaptan fácilmente a todas las circunstancias, pueden fallar las controversias que surjan haciendo siempre cumplida y verdadera justicia. (Énfasis suplido.) Alfaro, *op. cit.,* pág. 28. *Cf.* 1 Scott, *op. cit.,* Sec. 1, págs. 3–10.

Gustavo R. Velasco destaca tres cualidades sobresalientes del fideicomiso anglosajón cuya pertinencia es crucial si atendemos el curso final de redacción que siguió nuestra ley de fideicomisos: (1) el fideicomitente puede ser el beneficiario; (2) puede ser fiduciario un beneficiario cuando hay pluralidad de beneficiarios, y (3) una persona que posee un bien o patrimonio determinado puede declarar que lo transfiere en fideicomiso y que se constituye a sí mismo como fiduciario. G. R. Velasco, *Estudios sobre los principios del "trust" anglosajón,* México, 1945, citado en Alfaro, *op. cit.,* págs. 52 y 108. Nuestra Asamblea Legislativa incorporó directamente algunas de estas disposiciones del Derecho anglo-americano de *trust.* Allá es claro, como lo es aquí, que la condición de fideicomitente y de fideicomisario puede recaer en la misma persona. *Douglas* v. *Registrador,* 55 D.P.R. 665 (1939). La disposición relativa a que el fiduciario pueda también confundirse en el fideicomisario, siempre que el fiduciario no sea el único beneficiario, no fue incluida en nuestra ley. Sánchez Vilella, *El Fideicomiso Puertorriqueño III, op. cit.,* pág. 422 n. 17; 2 Scott, *op. cit.,* Secs. 99.1 y 115, págs. 797 y 884.

Por último, se destaca en el fideicomiso anglosajón un desdoblamiento del Derecho de propiedad. Bajo el mismo se hace una distinción entre el título legal de los bienes en fideicomiso y el título representativo de las utilidades que resultan de los mismos. El fiduciario es el dueño del título legal, mientras que la propiedad en equidad descansa en los beneficiarios. Esta división entre el título legal y la propiedad en equidad, ajena al Derecho civil, es la médula del concepto de *trust*. *Álvarez* v. *Sec. Hacienda*, supra, pág. 420; *Cabrer* v. *Registrador*, 113 D.P.R. 424 (1982).

## III

Al contrastar y examinar la ley de fideicomiso de Puerto Rico, encontramos en su intrincada definición el significado concreto de este recuento histórico:

> El fideicomiso es un mandato irrevocable a virtud del cual se trasmiten determinados bienes a una persona, llamada fiduciario, para que disponga de ellos conforme lo ordene la que los trasmite, llamada fideicomitente, a beneficio de este mismo o de un tercero llamado fideicomisario. Art. 834 del Código Civil, 31 L.P.R.A. sec. 2541.

■ Se importó de este modo el concepto de *trust* a la cultura jurídica latinoamericana, percibiéndolo como un mandato irrevocable, una comisión o encargo sui géneris, especial, nuevo, en el cual el mandante no pudiera deshacer y mediante el cual se desprendiera definitivamente del dominio de las cosas objeto del encargo. Alfaro, *op. cit.*, págs. 42 y 74.[6] Varios países siguieron la pauta y pensamiento de Alfaro. Mediante legislación fusionaron el *trust* a jurisdicciones de tradición civilista. Patton, *Trust Systems in the Western*

---

[6] Semejante visión del fideicomiso como un mandato irrevocable, antitética y contradictoria al decir del propio Alfaro, luego evoluciona en su pensamiento y lo califica simplemente como "un acto". L. F. Sánchez Vilella *El Fideicomiso Puertorriqueño III*, 37 Rev. C. Abog. P.R. 417, 423 n. 19 (1976).

*Hemisphere, op. cit.*, págs. 414–435. Nuestro ordenamiento jurídico no fue la excepción.

En esta conversión se consideraron y experimentaron varias alternativas: (1) reconocimiento de instituciones civiles similares al *trust;* (2) adopción del *trust* anglosajón por la vía estatutaria; (3) su adaptación conforme a principios del Derecho civil, y (4) su incorporación por la vía judicial. Sánchez Vilella, *Anteproyecto sobre un Código de fideicomisos para Puerto Rico, op. cit.*, págs. 3–7; Patton, *Trust Systems in the Western Hemisphere, op. cit.*, pág. 408.

En el 1925, Panamá sentó el precedente. Su estatuto habilitador representó en el hemisferio Sur la primera pieza legislativa, aunque con matices civilistas. Le siguió México en 1926. Puerto Rico se unió a esa corriente en 1928. Se adoptó legislación compatible con el modelo de fideicomiso panameño. La expansión legislativa continuó. Bolivia, Argentina, Brasil, Colombia, Costa Rica, El Salvador y Perú, en extremos limitados, integraron algunas funciones del *trust* en las transacciones bancarias. El fenómeno resultante fue la creación de "fideicomisos de concepción local". Patton, *Trust Systems in the Western Hemisphere, op. cit.*, págs. 434–435.

Bajo una segunda modalidad de incorporación directa del *trust* anglosajón, se destacan otras jurisdicciones de Derecho civil como Québec, Louisiana y Filipinas. La experiencia original compartida fue de rechazo. Las constituciones de 1812, 1845 y 1852 de Louisiana, bajo la influencia del Código napoleónico, prohibían la creación de fideicomisos. En 1938 legislaron para incorporar al fideicomiso, siguiendo los principios generales trazados por el American Law Institute sobre la materia. El estatuto redactado en el 1964 superó las redacciones anteriores y al presente, comparativamente se considera como uno de los de más amplia cobertura en una jurisdicción civil. Actualmente las disposiciones del Código Civil se interpretan liberalmente a favor de la libre disposición. La regla de hermenéutica estatutaria es que tales preceptos no

podrán ser invocados para frustrar un acto de disposición sancionado expresa o implícitamente por la ley de *trust*. 6 La. Civ. Code Ann. Art. 1724 (West 1952); 11 *Oppenheim & Ingram, Louisiana Civil Law Treatise*, 75 y ss. (1977); *Lelong* v. *Succession of Lelong*, 164 So. 2d. 671 (La. App. 3rd Cir. 1964); *Succession of Stewart*, 301 So. 2d 872 (La. 1974). Véanse además Comentario, *Why no Trusts in the Civil Law?*, 2 Am. J. Comp. L. 204 (1953); J. M. Wisdom, *A Trust Code in the Civil Law, Based on the Restatement and Uniform Acts: The Louisiana Trust Estates Act*, 13 Tul. L. Rev. 70 (1938); *Cf.* Nussbaum, *op. cit.*, pág. 422; Sánchez Vilella, *El Fideicomiso Puertorriqueño IV, op. cit.*, pág. 453 n. 3; Sánchez Vilella, *The Problems of Trust Legislation in Civil Law Jurisdictions, op. cit.*, pág. 386 n. 69.

Québec presenta también otras particularidades. Se ha apuntado que esta provincia optó por la vertiente limitada de la "fiducia". Ello motivado por la falta de flexibilidad en su cuerpo de ley, característica distintiva del *trust* anglosajón. En ese sentido se atribuye a esa legislación la pretensión de revivir y extender la fiducia romana. Tal conclusión se debate. Una postura en contrario la clasifica como un nuevo método intermedio en la regulación del fideicomiso. Sánchez Vilella, *The Problems of Trust Legislation in Civil Law Jurisdictions, op. cit.*, págs. 382, 388. Québec con menor timidez que Louisiana incorporó algunas modalidades del *trust*, aun cuando suprimió muchas reglas del *common law*. Nota, *Common Law Trusts in Civil Law Courts*, 67 Harv. L. Rev. 1030, 1034 (1954); Nussbaum, *op. cit.*, pág. 422. Indistintamente de la polémica relativa a su género y denominación como "fiducia", para algunos se trata del *trust* anglosajón. Patton, *Trust Systems in the Western Hemisphere, op. cit.*, pág. 411. El Tribunal Supremo de Québec ha favorecido este último enfoque. *Curran* v. *Davis*, 1 D.L.R. 161 (1934). Sin embargo, la cuestión está pendiente ante legislación que revisaría el estatuto de fideicomiso. Véanse *Rapport Sur Le Code Civil du*

*Québec, Projet de Code Civil,* Québec, Ed. Officiel du Québec, 1977, Vol. I, págs. 325–331; íd., Vol. II, T. 1, págs. 533–542.

En Filipinas, el Tribunal Supremo ha hecho claro que los precedentes angloamericanos serán considerados preeminentemente en atención al uso frecuente de dicha institución en Estados Unidos e Inglaterra, [7] y a su desconocimiento en España. *Government of the Philippine Islands* vs. *Abadilla,* 46 Phil. Rep. 642, 646–647 (1924). Su estatuto incorpora los principios generales de Derecho del *trust* en el Art. 1442. La intención legislativa quedó plasmada en su exposición de motivos:

> This article incorporates a large part of the American law on trusts and thereby the Philippine legal system will be amplified and will be rendered more suited to a just and equitable solution of many questions. Reporte de la Comisión Codificadora, citado en: A. Padilla, *Civil Law, Civil Code Annotated,* 6ta ed., Manila, Filipinas, Ed. Padilla Pub., 1974, Vol. V, Art. 1442, pág. 72 y ss.

Latinoamérica favoreció esta tendencia de incorporación directa del *trust.* Sin embargo, esa idea no cuajó por completo legislativamente en sus respectivas jurisdicciones.

Así, la Primera Convención de la Asociación Interamericana de Abogados en La Habana (1941) se pronunció:

> That it recognizes the advisability and feasibility of incorporating in the civil law of the Latin American Countries the institution of the trust along the lines upon which it exists in Anglo-Saxon countries, and recommends the enactment of adequate laws so that in this important matter the two great legal systems in force in the American continent

---

(7) Es significativo notar que en países de Derecho civil que por razones históricas se mantuvieron al margen de las innovaciones en el ámbito de la codificación del Derecho de propiedad, en particular de Inglaterra, también asimilaron rápidamente el concepto de *trust.* Tal fue el caso de Sur África, Ceilán, los territorios de Derecho romano-holandés, la provincia de Québec en Canadá y Escocia. 11 *Oppenheim & Ingram, Louisiana Civil Law Treatise* 65 (1977), *cf.* J. Mayda, *"Trusts"* and *"Living Law" in Europe,* 103 U. Pa. L. Rev. 1041 (1955).

may be brought into harmony. 1 Inter Am. Bar Ass'n. Rep. 164. Patton, *Trust Systems in the Western Hemisphere, op. cit.,* pág. 433.

En las convenciones posteriores de Brasil (1943), México (1944) y Chile (1945) el criterio fue reafirmado. Patton, *Trust Systems in the Western Hemisphere, op. cit.,* págs. 433–434. El doctor Alfaro, figura cimera en este proceso, ratifica y compendia así esta posición:

> En otras palabras, algunas de las transacciones que se efectúan en los países anglosajones por medio del *trust,* pueden realizarse conforme a determinadas instituciones del derecho civil, pero los fines que pueden alcanzarse en casos complejos por medio de un solo instrumento de trust, no podrían serlo según las normas civilistas sino recurriendo a los preceptos de varias, a menudo numerosas, instituciones. *En resumen, no hay un equivalente directo, general y completo del trust* en el derecho civil. (Énfasis suplido.) Alfaro, *op. cit.,* pág. 17.

El camino, como hemos podido apreciar, no ha sido fácil ni uniforme. El derrotero seguido en las jurisdicciones civilistas en su intento por adaptar el *trust, sensu contrario,* fue recurrir por analogía a diversas figuras jurídicas del Derecho civil. P. Lepaulle, *Civil Law Substitutes for Trusts,* 36 Yale L.J. 1126 (1927); Nota, *op. cit.,* pág. 1030; Sánchez Vilella, *The Problems of Trust Legislation in Civil Law Jurisdictions, op. cit.,* págs. 376–381; Claret, *op. cit.,* págs. 7–12; Alfaro, *op. cit.,* págs. 16–19. Véase *Álvarez* v. *Srio. de Hacienda,* supra, pág. 46, en reconsideración. (Opinión concurrente de los Jueces Asociados Señores Belaval y Negrón Fernández.)

La trayectoria histórica y comparada antes relacionada, al igual que en otras áreas del Derecho, invita a una profunda reflexión sobre la formulación de nuestra visión del fideicomiso. Las coordenadas deben trazarse sin borrones en cuanto a la solución de controversias de este género. Las funciones del *trust* anglosajón no pueden ajustarse al Derecho civil en su acepción pura formal sin que incurramos en el peligro de

una adjudicación injusta basada en un anacronismo histórico. Acotemos nuestra responsabilidad: la incorporación del fideicomiso anglosajón a nuestra jurisdicción implica que debemos enriquecernos de su acervo cultural y jurídico. Su armonización conforme a los preceptos del Derecho civil no puede constreñir la institución que se quiso integrar. Nutrámosle de la flexibilidad que caracteriza al *trust* anglosajón y atemperemos nuestra ley abandonando los criterios de rigidez e inmovilidad de la fiducia romana.

■ A modo de compendio, nuestra adaptación de la ley panameña de fideicomisos no creó un todo coherente e integrado a perfección. Nuestra ley tiene zonas grises, lagunas y vacíos. Hasta tanto se legisle sobre el particular, esas deficiencias no se atienden adhiriéndonos exclusivamente al respetable pensamiento de Alfaro. La lección es clara. La creación del fideicomiso puertorriqueño tomó como punto de partida la obra del ilustre panameño, mas la intención central fue incorporar a nuestro ordenamiento jurídico, con ajustes, el *trust* anglosajón. Esta innegable realidad sirve de guía. Es hacia las características de éste donde hay que acudir para resolver, con debido respeto a nuestra tradición civilista, muchas de las interrogantes que plantea nuestra Ley Núm. 41 de Fideicomisos de 23 de abril de 1928.

## IV

Atendida la naturaleza jurídica de esta institución en sus dimensiones históricas y legales, analicemos la validez del documento otorgado por Sergio Dávila Declet. En esa misión, es menester examinar específicamente si se cumplieron con las formalidades establecidas en la ley.

Primeramente consideremos si el documento tiene que cumplir con los requisitos que el Código Civil establece para efectuar una donación.

■ De la lectura integral del documento aflora inequívocamente la intención de Dávila Declet de establecer un fideicomiso sobre unos bienes supuestamente donados. Sobre este extremo, resulta redundante al acto de constitución del fideicomiso la expresión del fideicomitente de que "ha donado" a sus nietos cierta cantidad de acciones de una corporación. Según se ha expuesto el fideicomiso ínter vivos comprende una donación en fideicomiso. Sánchez Vilella, *El Fideicomiso Puertorriqueño III, op. cit.*, pág. 436. Esto es, el fideicomiso implica la transmisión de propiedad o dominio de la cosa de que se trate.

■ Bajo la premisa subyacente de que en el fideicomiso hay un traspaso de la propiedad, la ley de contribuciones sobre herencias y donaciones, —Núm. 303 de 12 de abril de 1946, sección primera— dispone que "la donación incluye también cualquier transferencia en fideicomiso". 13 L.P.R.A. sec. 881. *Belaval* v. *Tribunal de Expropiaciones*, supra, pág. 276. Aún así, el *trust* y la donación son figuras jurídicas distintas. *Restatement (Second) of Trust*, Secs. 25 y 37a. Las disposiciones del Código Civil que regulan la donación en su sentido formal, no aplican a los hechos ante nuestra consideración. No existe el *trust* en el caso de la donación pura. (⁸)

En este aspecto, erró el tribunal de instancia al determinar como cuestión de derecho que no se había cumplido con las formalidades requeridas por la ley, específicamente que los nietos del causante no aceptaron por escrito la "donación", tal y como requiere el Código Civil cuando no concurre la en-

---

(⁸) De habernos encontrado ante una donación en estricto rigor, esto es pura, la determinación del tribunal de instancia hubiese sido correcta, pues encuentra apoyo en los Arts. 571, 572 y 574 nuestros, 31 L.P.R.A. secs. 2006, 2007 y 2009. Ese enfoque prevalece en la doctrina española que se ha mostrado renuente a admitir la aceptación tácita de la donación al declarar indispensable que la aceptación se haga constar por escrito. Arts. 629, 630 y 632 del Código Civil español. Véase J. M. Manresa, *Comentarios al Código Civil Español*, 7ma ed. rev., Madrid, Ed. Reus, 1972, T. IV., págs. 197–198.

trega simultánea de la cosa en casos de bienes muebles. Art. 574 del Código Civil, 31 L.P.R.A. sec. 2009. ([9])

Dicho tratamiento encontró eco en nuestra jurisprudencia del pasado. Sobre el particular hace algunos años —invocando los principios generales del fideicomiso norteamericano— expresamos que la regla mayoritaria es que una donación imperfecta no debe convalidarse so pretexto que lo constituido es un fideicomiso. *Álvarez* v. *Sec. Hacienda,* supra, pág. 424. Pero la discusión en ese caso giraba en torno a la aceptación de los beneficiarios como elemento esencial para la existencia legal del fideicomiso. De ahí, nuestra reconsideración de dicha determinación a los efectos de disponer que bajo la ley de fideicomiso de Puerto Rico no es necesaria la aceptación por parte del beneficiario para la concreción de su existencia legal. *Álvarez* v. *Srio. de Hacienda,* supra, págs. 28–29, en reconsideración. Nuestra interpretación se ajustó rigurosamente al texto de la ley, ([10]) dispositivo de que el fideicomiso no se perfecciona hasta que concurra la aceptación por el fiduciario. Dicha aceptación puede ser expresa o tácita, basada esta última en los actos del fiduciario para llevar adelante el fideicomiso. Art. 839 del Código Civil, 31 L.P.R.A. sec. 2546. Bajo este razonamiento, una vez admitida la aceptación tá-

---

([9]) Por otro lado, es argüible que siendo las acciones de corporación un bien mueble, a tenor del Art. 268 del Código Civil, 31 L.P.R.A. sec. 1064, concurre la entrega simultánea de la cosa mediante el acto mismo de transmisión en virtud de escritura pública, equivalente a la tradición. En el fideicomiso ínter vivos la escritura pública presume concluyentemente la tradición. Sánchez Vilella, *El Fideicomiso Puertorriqueño III, op. cit.,* pág. 438 n. 70. Ello configura la aceptación. Conforme el Art. 837 del Código Civil, 31 L.P.R.A. sec. 2544, el fideicomiso puede constituirse sobre toda clase de bienes. De acuerdo con los principios generales del fideicomiso norteamericano, un fideicomiso sobre acciones de corporación sería igualmente válido. *Álvarez* v. *Sec. Hacienda,* 78 D.P.R. 412, 425 (1955).

([10]) Este problema surge por haberse apartado nuestro legislador del principio del Derecho angloamericano de *trust* donde la existencia del mismo no depende en forma alguna de la aceptación por parte del fiduciario. Sánchez Vilella, *El Fideicomiso Puertorriqueño III, op. cit.,* pág. 438; 2 A. Scott, *The Law of Trusts,* Sec. 101 (3ra ed. 1967).

cita, se puede concluir lógicamente que no se requiere tampoco escritura pública para aceptar el fideicomiso ínter vivos. Sánchez Vilella, *El Fideicomiso Puertorriqueño III*, *op. cit.*, pág. 439. Semejante conclusión encuentra apoyo en el Derecho angloamericano, que no precisa de ninguna solemnidad para su aceptación. 1 Scott, *op. cit.*, Sec. 32, págs. 264–265; G. G. Bogert, *The Law of Trusts and Trustees*, 2da ed. rev., St. Paul, Minn., West Pub. Co., 1965, Sec. 150.

No existe dificultad real alguna, además, en que la figura del fideicomitente se confunda con la del fiduciario. Ello es parte de la esencia de la institución con que se quiso enriquecer nuestro Derecho civil. Bajo el régimen anglosajón, el fideicomiso puede ser creado por la transmisión de la propiedad al fiduciario y además por la declaración del fideicomitente de que posee la propiedad en fideicomiso a favor de un tercero. *Restatement, op. cit.*, Sec. 17. ([11]) No hay obstáculo para que así sea también en nuestro Derecho, tras el préstamo jurídico tan conscientemente realizado. A igual conclusión llega Alfaro:

> Por otra parte, las modalidades o variantes de que el fideicomitente pueda constituir el fideicomiso en favor de sí mismo; o de que un fiduciario pueda ser también beneficiario; o de que el fideicomitente se transforme en fiduciario, *no alteran ni la esencia ni la existencia de las tres figuras que*

---

([11]) Reza:

"A trust may be created by

"(a) *a declaration by the owner of property that he holds it as trustee for another person;* or

"(b) a transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person; or

"(c) a transfer by will by the owner of property to another person as trustee for a third person; or

"(d) an appointment by one person having a power of appointment to another person as trustee for the donee of the power or for a third person; or

"(e) a promise by one person to another person whose rights thereunder are to be held in trust for a third person." (Énfasis suplido.)

*entran en el trust. Las tres figuras están siempre presentes en la operación.* Lo que pasa es que consumada ésta, una de ellas puede desaparecer o dos de ellas pueden concurrir en una misma persona. Alfaro, *op. cit.,* págs. 52–53. (Énfasis suplido.)

A tono con este enfoque, el fideicomiso que nos ocupa nació, se ejecutó y extinguió conforme al término de vencimiento establecido por Dávila Declet. Hubo aceptación. Durante todo ese tiempo las peticionarias cumplieron con el mandato. Los beneficiarios recibieron sus ganancias. Resultaría injusto penalizar a estos menores por una redacción poco feliz de nuestra ley, por un germen de contradicción en una figura jurídica híbrida, en la que resulta difícil precisar los contornos de su conmixtión anglosajona y civilista. Evocando a Alfaro, reiteramos que el *trust* estuvo sometido a la jurisdicción de la equidad, sin sujeción a los rigorismos del Derecho común. Ello permite a los tribunales adjudicar las controversias de esta índole con atención a tal hecho histórico.

## V

Dirimida en sentido positivo la validez del fideicomiso constituido, sólo nos resta decidir si la transmisión de bienes hecha por Dávila Declet afectó o gravó en alguna forma legalmente inaceptable la legítima de los herederos forzosos.

En *Vda. de Fuxá* v. *Torres Aguilar,* supra, expresamos:

La única cuestión litigiosa sometida a este Tribunal es la siguiente: Si los fideicomisos en favor de los biznietos deben anularse en cuanto a una tercera parte —la de la legítima estricta— o en cuanto a dos terceras partes —legítima estricta más el tercio de mejora— según lo resolvió la ilustrada Sala sentenciadora. El recurrente alega que habiéndose establecido los fideicomisos en favor de dos biznietos, se puede validar la transmisión de bienes de los dos fideicomisos *inter vivos* en dos terceras partes, porque se puede mejorar a un biznieto y la recurrida alega que sólo puede validarse la transmisión de bienes en cuanto al tercio de libre disposición pues no se trata de un caso de mejora expresa.

Ante esa controversia, a base de las disposiciones del Art. 846 del Código Civil, 31 L.P.R.A. sec. 2553 —que prohíbe y declara nulos los fideicomisos constituidos con perjuicio o menoscabo de la legítima correspondiente a herederos forzosos— allí concluimos que en cuanto al tercio de libre disposición, la transmisión fideicomisaria ínter vivos era válida por ser una enajenación declarada por ley irrevocable. Asimismo, resolvimos que dada la redacción del Art. 752 del Código Civil, 31 L.P.R.A. sec. 2392 —dispositivo de que la mejora debe ser expresa— no podíamos considerar enajenado el tercio de mejora por el solo hecho de la declaración fideicomisaria. Invocamos la doctrina española. *Vda. de Fuxá* v. *Torres Aguilar*, supra, págs. 287–288. En iguales términos nos expresamos en *Clavell Rodríguez* v. *Registrador*, 95 D.P.R. 348, 352–353 (1967).

Se impone un reexamen de dichos dictámenes, en particular una precisión del concepto "mejora" ([12]) en el ámbito de

---

([12]) El inicio legislativo de la mejora son las disposiciones del Rey Chindasvinto (641–652) quien dictó a mediados del siglo VII su famosa ley *Dum Inlicita*, conservada más tarde por la Ley 1ra del Fuero Juzgo; compilación resultante de la fusión de la legislación visigoda con la legislación existente en los comienzos del siglo VI, establecida para los hispano-romanos (*Lex Romana Visigothorum*). J. De Lacoste, *La Mejora* (L. García-Guijarro, traductor), Madrid, Ed. Hijos de Reus, 1913, págs. 1–22. Su exposición de motivos dispuso:

" '. . . promulgamos las presentes sabias medidas, que en lo sucesivo deberán ser respetadas por todos, por las que, sin privar en absoluto al padre ó á la madre y á los abuelos de la facultad de disponer de sus bienes, se tiende á impedir que los hijos y descendientes sean olvidados completamente de la herencia de aquéllos por una decisión injusta' ". Ibíd., pág. 2.

En efecto, la verdadera *ratio* jurídico-política del precepto concibió una fórmula de transacción y armonía entre las costumbres de la población romanizada muy dada a una amplia libertad de testar y el criterio legislativo propio de los ocupantes de estirpe germánica fundado más bien en la sucesión forzosa, amparador de la familia y de los hijos. F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1963, T. V, Vol. 2, pág. 451. Se resucita la antigua idea de la copropiedad familiar, fundada sobre una especie de *collaboratio* en el trabajo común de padres e hijos. Lacoste, *op. cit.*, pág. 51.

Durante la Edad Media, el *Liber judiciorum* prevalece en toda España, por lo que se piensa que subsistió la mejora. A partir de esa época, el Derecho visigodo va desapareciendo aceleradamente. Surge entonces un derecho

una transmisión fideicomisaria cuando se hace a favor de descendientes que no son herederos forzosos. Ello requiere a su vez, deslindar el alcance de la legítima de los hijos o herederos forzosos en tales circunstancias.

■ En su acepción formal, la mejora es aquella porción detraída de la legítima hasta el máximo del valor líquido del tercio de la herencia, exclusión hecha de la parte de libre disposición, que el ascendiente otorga a sus hijos y descendientes, o a cualquiera de ellos indistintamente. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1977, T. V, Vol. 3, pág. 51; J. R. Vélez Torres, *Derecho de Sucesiones*, Madrid, Imprenta Sáez, 1974, pág. 149; C. Valverde y Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Ed. Cuesta, 1939, T. V, págs. 277–279; F. Puig Peña, *Tratado de Derecho Civil Español*, Barcelona, Ed. S. A., 1977, T. II, Vol. 3, pág. 451; J. Castán Tobeñas, *Derecho civil español común y foral*, 8va ed. rev., Madrid, Ed. Reus, 1979, T. VI, Vol. 2, pág. 579; González Tejera, *op. cit.*, pág. 419 y ss.

---

consuetudinario muy variado, que engendra los fueros municipales, en los que la institución de la mejora sufrirá múltiples restricciones. Desde el siglo XI hasta fines del XIII, se generan costumbres completamente opuestas al concepto de la mejora, siguiendo el principio de sucesión forzosa y del reparto de los bienes, bajo un sistema de rigurosa igualdad. Su sola excepción fue el privilegio feudal o militar de primogenitura. Lacoste, *op. cit.*, págs. 90, 104. Ello explica por qué muchos fueros municipales rechazan la institución de la mejora: Alcalá, Cuenca, Zamora, Sepúlveda y el Fuero Viejo. Siguiendo esta tendencia Las Partidas también abandonan la institución de la mejora. Se desconoce cuándo, pero posteriormente se regresó al sistema legislativo hispano. Fueros como el de Soria y el Real en el mismo siglo XIII establecen su regulación. Más tarde en el siglo XIV, las Leyes del Estilo retornan el instituto que sobresale en las famosas Leyes de Toro. Estas pasarán a la Nueva y Novísima Recopilación, y como derecho vigente, subsistirán hasta la promulgación del Código Civil. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1977, T. V, Vol. 3, pág. 51. El resultado de esta evolución histórica tiene su culminación en la redacción definitiva del Código español que en sus Arts. 808 y 823 absorbió la vieja concepción tradicional de la ventaja legitimaria, como se desprende del *Liber judiciorum*, del Fuero Real y de las Leyes de Toro. Lacoste, *op. cit.*, pág. 212.

El Código Civil recoge el concepto legal de mejora en su Art. 737 del siguiente modo:

> Sin embargo, podrán éstos disponer de una parte de las dos que forman la legítima, para aplicarla como mejora a sus hijos y descendientes legítimos. . . . 31 L.P.R.A. sec. 2363.

El Art. 751 reafirma esa visión:

> El padre o la madre podrán disponer a favor de alguno o algunos de sus hijos o descendientes de una de las dos terceras partes destinadas a legítima. 31 L.P.R.A. sec. 2391.

Resulta claro que el Art. 737 sitúa la mejora como una parte de la legítima de los hijos y descendientes legítimos. También el propio Art. 751 la ubica en una de las dos terceras partes destinadas a la legítima. Siendo así, es incuestionable que esa cuota legitimaria sólo corresponde a los hijos y descendientes legítimos. El tercio de mejora implica libertad de disposición del causante dentro del grupo de descendientes legítimos. Puede recaer en descendientes legítimos aunque vivan los de grado intermedio. Así, a modo de ejemplo, un nieto puede ser mejorado aunque su padre viva. Es decir, pueden ser mejorados los descendientes legítimos: hijos, nietos, biznietos. Puig Brutau, *op. cit.*, págs. 70–71; F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1963, T. V, Vol. 2, pág. 465; Castán Tobeñas, *op. cit.*, pág. 589; Valverde y Valverde, *op. cit.*, págs. 286–288. Véase *Díaz Lamoutte* v. *Luciano*, 85 D.P.R. 834, 851 (1962).

Es clásica la distinción entre mejoras expresas y tácitas. La primera no suscita dificultad. El testador manifiesta de manera clara y terminante su propósito de establecerla. En cambio, la mejora tácita ha generado debates en casos en los que el causante no ha manifestado claramente su intención de mejorar, y se plantea que la misma se infiere de hechos o manifestaciones de voluntad, es decir, se deduce su existencia aun cuando el testador no lo expresa. Puig Peña, *op. cit.*, pág.

456; Vélez Torres, *op. cit.*, pág. 154. La cuestión no es ajena a nuestra doctrina jurisprudencial. Sobre el particular, en el pasado hemos expresado:

> La interpretación judicial podrá ir en auxilio de esa voluntad de mejorar mas no al extremo de adivinarla y escogerla de entre supuestos coexistentes. ". . . de todas maneras la palabra 'expresa', que establece nuestra Ley, puede ser entendida en el sentido de que quede *bien clara la voluntad del causante,* aun cuando éste no manifieste de una manera formal su intención de mejorar, y siempre que no aparezca la posibilidad de un sentido equívoco". *Pérez v. Pérez Agudo,* 103 D.P.R. 26, 29 (1974).

Como regla general, la mejora ha de establecerse de modo expreso. La manifestación de voluntad debe ser precisa. Así lo contempla nuestro Código Civil. Ninguna donación por contrato entre vivos, sea simple o por causa onerosa, en favor de hijos o descendientes que sean herederos forzosos, se reputará mejora, si el donante no ha declarado de una manera expresa su voluntad de mejorar. Art. 752 del Código Civil, 31 L.P.R.A. sec. 2392. De igual forma, la manda o legado hecha por el testador a uno de los hijos o descendientes, no se reputará mejora, sino cuando el testador haya declarado de una manera expresa su voluntad de mejorar. Art. 755 del Código Civil, 31 L.P.R.A. sec. 2395. Sin embargo, la ley prevé instancias de mejora tácita. En caso de que el testador dejare manda o legado a uno de los hijos o descendientes se reputará mejora cuando no quepa en el tercio libre. Art. 755 del Código Civil, 31 L.P.R.A. sec. 2395. De igual forma, las sustituciones fideicomisarias nunca podrán gravar la legítima, y si recayeren sobre el tercio destinado a la mejora, sólo podrán hacerse en favor de los descendientes. Art. 711 del Código Civil, 31 L.P.R.A. sec. 2309.

De lo expuesto, surge que son admisibles las mejoras tácitas. Se ha sostenido que "expreso" no se opone a "tácito". En latín *expressus* significaba una declaración clara, pero no una

declaración formal. En castellano, "expreso" significa claro y patente, pero no exige el uso de ninguna palabra sacramental. J. Vallet De Goytisolo, *Comentarios al Código civil y compilaciones forales*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1982, T. XI, pág. 348.

 Examinado el origen de la mejora, como institución, particularmente su evolución en las Leyes Núms. 26 y 29 de Toro y en el Art. 657 del proyecto de 1851, se advierte que las donaciones no colacionables cuando se trata de descendientes que no son herederos forzosos, son mejoras en sentido amplio. No existe impedimento en que se imputen al tercio de mejora en cuanto no quepan en el de libre disposición. Esta conclusión parte de la premisa de que las donaciones en concepto de mejoras no se colacionan. Vallet De Goytisolo, *op. cit.*, pág. 340. Encuentra apoyo en el Art. 747 del Código Civil, al disponer que "[l]as donaciones hechas a los *hijos* que [no] tengan el concepto de mejoras se imputarán en su legítima". (Énfasis suplido.) Este lenguaje excluye a descendientes que no son herederos forzosos. En su correcta dimensión, resolvemos que el requisito contenido en el Art. 752 del Código Civil, de que la donación ha de ser expresa para que se repute mejora, sólo es de aplicación cuando ésta se hace "en favor de hijos o descendientes que sean herederos forzosos". Nos explicamos. ([13])

 Primeramente, es unánime el criterio de que el Art. 751 del Código Civil, 31 L.P.R.A. sec. 2391, admite la posibilidad de mejorar descendientes que no sean herederos forzosos. Sin embargo la doctrina está dividida en cuanto al requisito de que la mejora sea expresa. Burón y Lacoste decididamente se pronunciaron en favor de la mejora tácita, a título de donación, a favor de descendientes que no son herederos forzosos.

---

([13]) A pesar de la claridad del texto, su aplicación ha sido indiscriminada, incluso, en *Vda. de Fuxá* v. *Torres Aguilar*, 85 D.P.R. 285 (1962).

Se basan en el criterio antes apuntado de que el Art. 752 limita su alcance a hijos o descendientes que sean herederos forzosos. Lacoste explica que el requisito de que la mejora sea expresa tiene el sabio propósito de dar a conocer la voluntad del disponente respecto a sus hijos o herederos forzosos, despejando a priori toda duda de si se trata de un anticipo sobre la parte de la legítima o una ventaja legitimaria. Esa incertidumbre sobre la liberalidad y voluntad del disponente no existe en cuanto a un descendiente que no tiene ningún derecho a legítima. En esa situación el traspaso toma un carácter definitivo y evidente. J. De Lacoste, *La Mejora* (L. García-Guijarro, traductor), Madrid, Ed. Hijos de Reus, 1913, pág. 29 y Buron, *Derecho Civil*, T. II, pág. 90, citados en Vallet de Goytisolo, *op. cit.*, pág. 345.

En igual sentido, Otero y Valentín([14]) expresa:

"[S]e considera anticipo de mejora la donación hecha a un nieto cuyo padre vive" . . . "[c]omo lo dado al nieto, por ser tal, no puede hacerse en concepto de legítima, tiene que considerarse como mejora, salvo en caso de que el padre del nieto no viviera o fuere indigno de heredar".

■ Vemos pues que las donaciones otorgadas a favor de descendientes no tienen otra limitación que la legítima estricta de los demás descendientes. Vallet De Goytisolo, *op. cit.*, págs. 339–346. Comparten este criterio, R. Roca Sastre, *Notas al Kipp*, L. Enneccerus, T. Kipp y M. Wolff, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 1951, T. V, Vol. 2, Sec. 138, pág. 364; J. J. López Jacoiste, *La Mejora en Cosa Determinada*, Madrid, Ed. Rev. Der. Privado, 1961, pág. 139; A. Elfgen, *La mejora en el vigente derecho español*, 63 Rev. Der. Not. 7 y ss. (1969); Puig Brutau, *op. cit.*, pág. 55 y ss.; Puig Peña, *op. cit.*, pág. 457 y ss. En contra, J. L. Lacruz Berdejo

---

([14])·Citado en J. Vallet De Goytisolo, *Comentarios al Código civil y compilaciones forales*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1982, T. XI, pág. 346.

y F. A. Sancho Rebullida, *Derecho de Sucesiones*, Barcelona, Ed. Bosch, 1973, Vol. II, Sec. 69.422, pág. 66; D. Espín Cánovas, *Manual de Derecho Civil Español*, 3ra ed., Madrid, Rev. Der. Privado, 1970, Vol. V, Sec. 4, Cap. II, pág. 429.

▮▮▮ En resumen, el tercio de mejora es legítima frente a extraños; no lo es respecto a descendientes entre sí. "No caben mejoras presuntas, pero tampoco son admisibles las reducciones presuntas. . . . No hay aquí mejora presunta, sino mejora tácita, necesaria para evitar una reducción presunta." Vallet De Goytisolo, *op. cit.*, pág. 343. Por ende, pueden ser mejorados los nietos tácitamente, sin que resulte en un "gravamen" o "menoscabo" sobre la legítima de los herederos forzosos. (¹⁵) Por analogía de lo previsto para las donaciones no colacionables en el Art. 990 del Código Civil, 31 L.P.R.A. sec. 2842, (¹⁶) las efectuadas a favor de nietos deben tomarse con preferencia del tercio libre. Sólo en cuanto a su exceso sobre el valor del mismo, se imputarán al tercio de mejora. Roca Sastre, *op. cit.*, pág. 359; Puig Brutau, *op. cit.*, pág. 61; Vallet De Goytisolo, *op. cit.*, pág. 347.

▮ Finalmente, procede en el caso de autos evaluar los efectos del fideicomiso, si algunos, sobre la legítima corta. Esclarecida la amplitud y cobertura de nuestra Ley de Fideicomiso, es perfectamente armonizable con el Derecho sucesorio cuando se activan las funciones del *trust*. Al calibrar la cuestión y una vez superadas las restricciones infundadas, no cabe duda que en determinadas circunstancias, válidamente, un fideicomiso puede recaer sobre la legítima corta de los herederos forzosos, sin que constituya un "menoscabo" o "grava-

---

(¹⁵) Arts. 13 y 14 de la Ley de Fideicomiso, 31 L.P.R.A. secs. 2553 y 2554; Arts. 711, 741 y 751 del Código Civil, 31 L.P.R.A. secs. 2309, 2367 y 2391.

(¹⁶) Reza:

"La colación no tendrá lugar entre los herederos forzosos si el donante así lo hubiese dispuesto expresamente. . . ."

men" sobre la misma dentro del significado del Art. 846 del Código Civil. Un estudioso sobre la materia expone correctamente las condiciones que deben satisfacerse, a saber: "1. El legitimario sea menor o incapaz; 2. el legitimario sea el único beneficiario de la renta y del *corpus;* y 3. el fideicomiso termine: (a) con la emancipación del menor, o (b) al cesar la incapacidad del incapaz, o (c) a la muerte del legitimario, si previamente no hubiera terminado al cesar su minoridad o su incapacidad." Sánchez Vilella, *El Fideicomiso Puertorriqueño II, op. cit.*, págs. 321–322.

Esta conclusión descansa en la premisa de que este diseño de administración fideicomisaria no menoscaba el derecho al beneficio total de la propiedad —*corpus* y "renta"— los cuales pertenecen al legitimario. Tampoco limita la capacidad de libre administración del heredero en cuestión, atendida su condición de minoridad o incapacidad. El cese del fideicomiso por muerte del legitimario o por haber advenido a la mayoridad o cesado la incapacidad, despeja cualquier interferencia posible con su patrimonio. Sánchez Vilella, *El Fideicomiso Puertorriqueño II, op. cit.*, pág. 322 y ss.

Aplicadas estas normas al caso de autos, resolvemos que por vía del fideicomiso los nietos de Dávila Declet fueron mejorados tácitamente en cuanto tal transmisión excedió el tercio de libre disposición de bienes.

Por los fundamentos expuestos, *se dictará sentencia y revocará la del Tribunal Superior, Sala de Bayamón, fechada 12 de diciembre de 1983. Dicho foro, tratándose de descendientes que no son herederos forzosos, procederá a determinar la totalidad del caudal hereditario e imputará el fideicomiso en el tercio de libre disposición y en cuanto exceda en el tercio de mejora. En cuanto a la legítima corta, por no cumplirse con las condiciones antes expuestas, no se intervendrá con la misma.*