Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se unen el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.
I
El 1 de julio de 2004 Jennymar Corporation solicitó a la Administración de Reglamentos y Permisos (A.R.Pe.) la *593 concesión de unas variaciones a los requisitos de zonifica-ción para el anteproyecto de mi desarrollo tipo “walk-up”, Marina Los Sueños, ubicado en un predio del Barrio Ense-nada del municipio de Rincón. El proyecto, con cabida superficial de 2,791.712 metros cuadrados, consistiría de un edificio de cuatro plantas, dividido en 24 apartamentos de dos habitaciones, para servir como residencias de veraneo o “second homes”. El anteproyecto original se había pre-sentado el 16 de junio de 2004 y la solicitud de servicios, el 18 de junio del mismo año. El proponente solicitó variar los siguientes requisitos de zonificación del distrito RT-0 que afectan el predio en controversia:(1) (1) la altura máxima de nueve metros y dos plantas a 10.36 metros y cuatro plantas; (2) el área bruta de piso de un máximo de 40% a 98.49%, y (3) la densidad poblacional de 700 metros cua-drados por unidad de vivienda, equivalente a 4 unidades de vivienda de acuerdo con la cabida del solar, a 147 metros cuadrados por unidad de vivienda, equivalente a 15.2 unidades de vivienda.(2)
A.R.Pe. decidió celebrar vistas públicas y en el Memo *594 rial Explicativo correspondiente anunció la presentación de un anteproyecto para el cual se solicitaba la concesión de una “variación en uso”. El proponente justificó las va-riaciones solicitadas aduciendo que, por “el alto costo de estos terrenos vacantes” en el sector, la aplicación literal y limitada de los requerimientos del reglamento de zonifica-ción de un distrito RT-0 resultaría en una confiscación del disfrute de la propiedad. En otras palabras, argüyó que edificar un edificio unifamiliar no le permite maximizar su derecho de propiedad, por lo cual alegó que debe autori-zarse un desarrollo de densidad media. (3)
A la vista pública comparecieron el Arq. Noel E. Añeses y los abogados de la parte proponente. Varios vecinos com-parecieron para oponerse al proyecto, entre éstos, el Sr. Leon J. Richter. También compareció la Fundación Surfri-der, Inc., Capítulo de Rincón. A nombre de la Fundación y del señor Richter, miembro de ésta, compareció el Ledo. Miguel Sarriera Román. Este declaró que el área donde se construiría el proyecto sufre de un problema grave de de-ficiencia en el abasto de agua y que en ocasiones los resi-dentes no han tenido el servicio de agua hasta por cinco días. Este problema se agravaría de aprobarse el proyecto sin mejoras en la infraestructura.
Alegó que los intereses de los peticionarios se verían afectados, ya que el desarrollo propuesto aumentaría la densidad poblacional, el ruido y el movimiento vehicular, rompiendo así la armonía y las características del vecindario. Finalmente, argüyó que el proponente no había presentado evidencia alguna que demostrara que la aplica-ción del reglamento de zonificación podría ser confiscato-ria, por lo cual la agencia debía denegar las variaciones como cuestión de derecho.
Tres días más tarde, el oficial examinador rindió su in-forme y recomendó favorablemente el proyecto propuesto. A.R.Pe. acogió dicha recomendación y aprobó el proyecto el *595 13 de enero de 2005. Posteriormente, la agencia denegó la reconsideración solicitada por la Fundación Surfrider, Inc., Capítulo de Rincón, y los peticionarios acudieron al Tribunal de Apelaciones.
Ante ese foro alegaron, en primer lugar, que A.R.Pe. no tenía jurisdicción, conforme al Reglamento de Planifica-ción Núm. 4, según enmendado por el Reglamento Núm. 6211 de 5 de noviembre de 2000, para aprobar un antepro-yecto para casas de apartamentos en un distrito RT-0. Ade-más, argüyeron que la aprobación de las variaciones soli-citadas era ilegal, puesto que su efecto es una rezonificación de facto del predio, para lo cual A.R.Pe. no tiene facultad, por haberse delegado dicha facultad estric-tamente a la Junta de Planificación. En la alternativa, ale-garon que las variaciones que la agencia concedió en este caso particular no se justificaron conforme a derecho. Luego de varios trámites procesales, el Tribunal de Apela-ciones confirmó la decisión de A.R.Pe. mediante sentencia dictada el 8 de junio de 2005.
Ante nosotros, la Fundación Surfrider, Inc. y el señor Richter alegaron esencialmente los mismos errores. Por su parte, el proponente recurrido reiteró los argumentos pre-sentados ante el Tribunal de Apelaciones y solicitó la des-estimación del recurso alegando que ni el foro apelativo ni este Tribunal Supremo teníamos jurisdicción para atender la solicitud de los peticionarios porque éstos no tenían le-gitimación activa. Sobre la Fundación Surfrider, Inc., adujo que el que ésta sea una corporación sin fines de lucro inscrita en el Departamento de Estado y dedicada a pro-mover la protección y el disfrute de los océanos, las playas y sus accesos, no es suficiente, de por sí, para reconocerle legitimación activa porque, según expuso, “nuestro pro-yecto no colinda con la playa” y la fundación no posee pro-piedad cerca del predio objeto de controversia.(4) Además, argumentó que “el mero hecho de mencionar que el señor *596 Richter vive en el Bo. Ensenada, cerca de nuestro proyecto, no es suficiente para establecer el grado de afectación de sus intereses personales”. (5)
Aunque el Tribunal de Apelaciones no discutió estos se-ñalamientos jurisdiccionales, afirmó en su sentencia que coincidía con la alegación de que “los recurrentes no pre-sentaron prueba ‘de en qué manera sus intereses quedar[o]n afectados en este proyecto’ ”. Apéndice, pág. 166. No obstante, el foro apelativo no desestimó el recurso, sino que procedió a resolver el asunto en los méritos y con-firmó la determinación de la agencia.
La opinión que hoy emite este Tribunal acoge los plan-teamientos del proponente y resuelve que los peticionarios carecen de legitimación activa para recurrir de la resolu-ción de A.R.Pe. porque no demostraron el grado de afecta-ción necesario para ser considerados como “parte” en el li-tigio, bajo la modalidad del participante activo. Conse-cuentemente, la mayoría desestima el recurso de los peticionarios. Como no coincido con esta apreciación, disiento.
II
La opinión mayoritaria sostiene que al no especificarse cuán cerca está la residencia del señor Richter del pro-yecto, su testimonio sobre la insuficiencia de agua en el sector y el efecto negativo que tendría la construcción del proyecto propuesto en su vecindario es una mera alegación generalizada de que sufriría un daño. Además, la mayoría concluye que no es suficiente la alegación de que se es ve-cino de un proyecto para demostrar que se tiene legitima-ción activa.
Ciertamente, hemos reconocido en otras ocasiones que no todo participante en un procedimiento administrativo *597 puede adquirir la condición de parte. Particularmente, en Rivera v. Morales, 149 D.P.R. 672 (1999), señalamos que la notificación de un aviso de vista pública a los vecinos de un proyecto, en cumplimiento de un requisito reglamentario, no les confiere a éstos, sin más, el derecho a ser reconoci-dos como parte en el proceso que se lleve a cabo en la agencia. Tomando en cuenta que la Sección 3.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. sec. 2155, permite a una persona con “interés le-gítimo” intervenir o participar en los procesos adjudicati-vos de las agencias administrativas, resolvimos en Lugo Rodríguez v. J.R., 150 D.P.R. 29, 43-44 (2000), que para fines de la L.P.A.U. son parte, no solamente el promovente, el promovido y el que haya solicitado formalmente interve-nir en el proceso, sino también la persona que haya parti-cipado activamente en las vistas públicas y cuyos derechos se verían afectados por la decisión de la agencia de tal manera que “resultaría injusto y arbitrario no considerarlo una ‘parte’ ”. Además, en Com. Ciudadanos v. G.P. Real Property, 173 D.P.R. 998 (2008), examinamos la distinción entre la comparecencia del “mero participante” y la inter-vención del “participante activo”, quien comparece para proteger sus derechos de una manera activa, aunque no haya solicitado intervenir formalmente, de tal manera que se convierte en parte.
Podemos reconocer un ejemplo del mero participante —el que no demuestra interés ulterior en el asunto, suple únicamente evidencia documental o comparece como amigo de la corte— en Rivera v. Morales, supra. En ese caso explicamos que las agencias consultadas por la Junta de Planificación para resolver una consulta de ubicación no eran partes, por la naturaleza de su participación, ya que ésta “consiste más bien en ilustrar a la Junta, en ayudarla a llevar a cabo su función de evaluar las consultas de ubi-cación y considerar la conveniencia o los perjuicios de los proyectos propuestos”. Íd., pág. 685. También, determina- *598 mos que no es necesario que se haya solicitado interven-ción formalmente para ser considerado “parte” en un pro-ceso adjudicativo, sino que lo esencial es analizar la naturaleza del interés del participante y de su interven-ción ante la agencia. Véase, también, Junta Dir. Portofino v. P.D.C.M., 173 D.P.R. 455 (2008), en el que resolvimos que la notificación de la resolución emitida no convierte automáticamente a la persona así notificada en parte en el procedimiento.
En fin, coincido con la mayoría en que ser vecino no necesariamente es suficiente para justificar la interven-ción de un participante en calidad de parte, puesto que, según la normativa elaborada en Rivera v. Morales, supra, y establecida formalmente en Lugo Rodríguez v. J.P., supra, es necesario que se demuestre un interés particular y una participación más plena en aras de proteger dichos intereses.
Lo que sucede es que en el presente caso los hechos de-muestran que el señor Richter no es un mero participante, sino todo lo contrario. El señor Richter no basó su interés exclusivamente en el hecho de ser vecino del proyecto. Su oposición se fundamentó en las consecuencias particulares que resultarían de la construcción del proyecto y las lesio-nes particularizadas que él sufriría de llevarse a cabo dicho proyecto en el lugar propuesto. El señor Richter compare-ció a las vistas públicas y sometió una ponencia escrita dirigida a proteger su derecho a conservar su calidad de vida y la naturaleza del vecindario. Ello, no sólo en res-puesta a su deber de ciudadano sino, además, como vecino del proyecto interesado en preservar las cualidades de su comunidad. Evidentemente, el señor Richter no fue un mero participante, ya que basó su comparecencia en un interés legítimo en el asunto objeto de adjudicación y no se limitó a suplir evidencia documental o actuar como amigo de la corte.
*599 Si bien es cierto que el expediente no dice específica-mente dónde reside el señor Richter con relación al pro-yecto, igualmente es cierto que el proponente, quien im-pugna la legitimación de los peticionarios para presentar este recurso, no refuta la cualidad de vecino alegada por él. Realmente, no hay razón para dudar de que el señor Richter es verdaderamente vecino del lugar. Surge del es-cueto informe de la vista pública que el oficial examinador reconoció que el señor Richter compareció en dicha calidad y así se hace constar en la autorización del anteproyecto, que fue notificada por A.R.Pe. al abogado de los peticionarios. A fin de cuentas, nadie cuestionó que el se-ñor Richter fuera un vecino del área impactada por el proyecto. No obstante, la mayoría está convencida de que, como no surge del expediente el lugar exacto de la residen-cia del señor Richter con relación al proyecto, su alegación de ser vecino es insuficiente para determinar los intereses afectados.
Sin embargo, ¿de qué nos sirve saber el lugar exacto de la residencia del señor Richter si nadie puso en duda su condición de vecino del lugar del proyecto? ¿Para corrobo-rar si el daño que alega sufrir es cierto? ¿Y si hubiéramos conocido el lugar exacto, de qué manera podría este Tribunal confirmar los daños sufridos por el señor Richter? ¿Cuán lejos es lejos para efectos de demostrar que los abas-tos de agua se verían afectados? No podemos exigir prueba pericial sobre esto para el propósito de evaluar la legitima-ción activa. ¿Y cuán cerca tiene que estar la residencia del señor Richter del proyecto para poder alegar a satisfacción de este Tribunal que el valor estético de su vecindario se afectaría, o que se afectaría el patrón del tráfico y la natu-raleza de su vecindario por el aumento en la densidad po-blacional?
Ciertamente, el grado de especificidad que la mayoría requiere para que un participante pueda demostrar el in-terés que busca proteger con su participación me parece *600 excesivo. No coincido con la apreciación de que el testimo-nio del señor Richter —consistente en que por ser vecino se vería afectado por la obra, específicamente, en lo que se refiere a los abastos de agua y el valor estético y ambiental de su comunidad— constituye una mera alegación genera-lizada que no es suficiente para mostrar la lesión particu-larizada que sufriría. Ahora bien, si la mayoría no está convencida de la naturaleza de la participación del señor Richter y entiende que no tiene la información en el expe-diente para determinarla, lo procedente sería devolver el caso a la agencia para que emita una resolución en cuanto a esto. De esta manera los tribunales podrían estar en po-sición de revisar esta determinación, como lo hemos hecho en otras ocasiones. Véase Junta Dir. Portofino v. P.D.C.M., supra. La desestimación del recurso, sobretodo en esta etapa de los procedimientos, es una grave injusticia.
Por otro lado, la opinión mayoritaria asevera que el grado de afectación que debe probarse para reconocerle le-gitimación al promovente de una acción justiciable en nuestros tribunales, debe ser idéntico al que se ha reque-rido en la jurisprudencia del Tribunal Supremo federal. Con ello, deshace más de medio siglo de desarrollo juris-prudencial sobre la legitimación activa de los ciudadanos para cuestionar acciones administrativas.
Explica la Opinión que la base del cambio de enfoque doctrinal reside en que nuestra Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) se inspiró en la Administrative Procedure Act (APA) y el Model State Administrative Procedure Act (MSAPA).(6) Según la Opinión, esto conlleva que al aprobar nuestra ley se haya incorporado también la jurisprudencia que interpreta la norma federal. El fundamento para esta conclusión es la regla de herme- *601 néutica según la cual, cuando se adopta una disposición de ley que proviene de otra jurisdicción se presume que se adoptó también la interpretación de esa ley en su lugar de origen.(7) Véanse: Pueblo v. Matos, 83 D.P.R. 335 (1961); Legarreta v. Tesorero de P.R., 55 D.P.R. 22 (1939); Pueblo v. Ramos, 18 D.P.R. 993, 1001 (1912); El Pueblo v. Colón, 15 D.P.R. 680 (1909); El Pueblo v. Puente, 14 D.P.R. 111 (1908). Acto seguido, el razonamiento jurídico mayoritario se dirige inexorablemente hacia la jurisprudencia federal, cuya interpretación de la legitimación es mucho más res-trictiva que la nuestra. Con ello, el Tribunal retrocede, no sólo en la disposición normativa sobre legitimación, sino en el rango que otorga a unas reglas que, más que normas, son guías para la interpretación. Esa ha sido la función de la “norma de hermenéutica” a la que responde la opinión mayoritaria, desde que se mencionó por primera vez, en 1904.(8) Llamo la atención entonces a que, aun cuando la opinión mayoritaria reconoce que esta regla de hermenéu-tica es una regla general que está sujeta a muchas excep-ciones y limitaciones, no menciona que en Pueblo v. Matos, supra, pág. 341, rehusamos aplicarla porque nuestra fun-ción no es aplicar una regla de hermenéutica, sino adoptar la interpretación “más justa y razonable”. Véase, también, Pueblo v. Pacheco, 83 D.P.R. 526, 531 (1961), resuelto ese *602 mismo año.(9) Además, en este caso no procede aplicar la norma general de interpretación a la que se refiere la opi-nión mayoritaria.
Primeramente, nuestra disposición sobre la revisión judicial, o sea, la Sección 4.2 de la L.P.A.U., 3 L.P.R.A. sec. 2172, no proviene de la APA federal, sino del MSAPA de 1981. Esto no quiere decir que nuestra ley sea un calco o una copia exacta de dicho modelo;(10) más bien, nuestra L.P.A.U. fue basada e inspirada en el MSAPA. Uno de los elementos autóctonos que distinguen nuestra ley de sus modelos es, precisamente, el amplio marco de legitimación adoptado. Por otra parte, no debemos olvidar que el MS-APA no es más que lo que indica su título, un modelo a considerarse en la promulgación de legislación administra-tiva uniforme para cada estado. (11) Por ende, una Ley de *603 Procedimiento Administrativo Uniforme puede ser aún más amplia que lo que provee el modelo, como es nuestro caso. Nuestra ley sólo requiere, para admitir la interven-ción en un proceso administrativo, que se demuestre un interés “que pueda ser afectado adversamente”, mientras la MSAPA propone un interés que pueda ser afectado sustancialmente. Más aún, según la L.P.A.U., la agencia está obligada a aplicar los criterios para conceder la inter-vención “de forma liberal”.(12) Este Tribunal ha desarro-llado toda una normativa sobre la legitimación basada en el interés “adversamente afectado” y ha cristalizado a tra-vés de los años la gran importancia que tiene en nuestro ordenamiento el garantizarle el acceso a los tribunales a los ciudadanos que procuran la revisión judicial de una determinación administrativa. Claramente, en el caso ante nuestra consideración, la L.P.A.U. provee legitimación es-tatutaria a los demandantes y, por lo tanto, no es necesario obviar nuestra disposición en aras de imponer los requisi-tos más restrictivos del standing constitucional federal.
En segundo lugar, aunque nuestra jurisprudencia no deja expresamente plasmadas cuáles son las “muchas ex-cepciones y limitaciones” que deben servir de contrapeso a la regla de interpretación utilizada por la mayoría, no hay duda que cuando su aplicación contraviene todo un cuerpo *604 robusto de razonamientos e interpretaciones jurídicas pro-pias, nos hemos topado con una de estas excepciones.
La tendencia del Tribunal Supremo federal en cuanto a la legitimación cuando se dilucidan asuntos de alto interés público, como son, sin duda, los relacionados a nuestra po-lítica constitucional ambiental, contrasta fuertemente con la nuestra.(13) El Prof. Luis E. Rodríguez lo explica así:
Los demandantes en acciones bajo N.E.P.A. tienen que demos-trar un daño real (injury in fact), y que están dentro de la zona de interés protegido por la legislación que alegadamente fue incumplida por la agencia gubernamental. Este daño real a su vez requiere un nexo causal entre la acción gubernamental que presuntamente incumple con N.E.P.A. y un daño al am-biente que afecta el disfrute por el demandante de ese am-biente en particular. No obstante, en Salas Soler, nuestro Supremo advirtió que la Ley 9 [Ley sobre Política Pública Ambiental] va [sic] más amplia que N.E.P.A. en esta área toda vez que provee “expresamente para el ejercicio en determina-das circunstancias de una acción pública, limitada al mandamus, por ciudadanos privados” .... Por consiguiente, podemos concluir que “Salas Soler” estableció que la Ley 9 permite una aplicación liberal de los requisitos necesarios bajo la doctrina de legitimación activa aun cuando se aplique restrictivamente bajo N.E.P.A. (Escolios omitidos y énfasis nuestro.) Luis E. Rodríguez, Derecho Ambiental, 67 (Núm. 4) Rev. Jur. U.P.R. 907, 911-912 (1998).
Ciertamente, el National Environmental Policy Act (NEPA) fiie el modelo utilizado en la elaboración de nues-tra Ley sobre Política Pública Ambiental, pero nueva-mente, nuestra ley no es meramente un calco de las dispo-siciones federales.(14) Una de las disposiciones más *605 importantes que distinguen nuestra ley de la NEPA es la que expresamente concede legitimación activa para hacer cumplir la ley a cualquier persona natural o jurídica afec-tada por la falta de implantación de ésta. Véanse: Art. 19 de la Ley sobre Política Pública Ambiental, Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. sec. 8002m); Art. 20 de la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de jimio de 1970 (12 L.P.R.A. sec. 1139). En Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 726 (1974), determinamos que la capacidad para incoar un pleito para asegurar el cumplimiento de la Ley sobre Política Pública Ambiental responde al claro deber público que la misma ley impone. Basamos parte del análisis en nuestras opinio-nes en Cerame-Vivas v. Srio. de Salud, 99 D.P.R. 45 (1970), y en Asociación de Maestros v. Pérez, Gobernador Int., 67 D.P.R. 848 (1947). En éstas explicamos que, cuando se trata de cuestiones de interés público, el pueblo se consi-dera como parte especialmente interesada y no es necesa-rio que el ciudadano demuestre que tiene un interés especial en el resultado del caso para poder presentar un recurso de mandamus. Particularmente, en Asociación de Maestros v. Pérez, Gobernador Int., supra, pág. 851, resol-vimos que para ello “|b]asta demostrar que es un ciuda-dano y como tal está interesado en la ejecución y protección del derecho público”.
Cuando el interés del ciudadano parte de la protección y ejecución de una política pública, hemos requerido, como requisito de toda acción legitimada, que se demuestre que el incumplimiento alegado le causa cierto grado de afecta- *606 ción; pero la afectación requerida no se limita al daño eco-nómico y la legitimación puede surgir de consideraciones ambientales, recreativas, espirituales o estéticas. Salas Soler v. Srio. de Agricultura, supra, pág. 723. Cf. Fund. Arqueológica v. Depto. de la Vivienda, 109 D.P.R. 387 (1980). Nuevamente, señalamos en Misión lnd. P.R. v. J.P., 146 D.P.R. 64, 174 esc. 70 (1998):
La suficiencia de este interés para conferirle legitimación ac-tiva a la parte peticionaria está plenamente justificada cuando se trata de un recurso de mandamus para solicitar el cumpli-miento de alguna disposición de Ley sobre Política Pública Ambiental, debido al origen constitucional de la política pú-blica enunciada en esta legislación.
Este análisis no se ha aplicado únicamente al recurso de mandamus. También hemos reconocido la validez y proce-dencia del recurso de injunction para que un ciudadano pueda hacer valer la Ley de Política Pública Ambiental. Mun. de Loíza v. Sucns. Suárez et al., 154 D.P.R. 333, 352, 368-369 (2001); Colón y otros v. J.C.A., 148 D.P.R. 434, 452 (1999); Misión Ind. P.R. v. J.P y A.A.A., 142 D.P.R. 656, 682 (1997). En fin, fundamentándonos en Salas Soler v. Srio de Agricultura, supra, y Asociación de Maestros v. Pé-rez, Gobernador Int, supra, desde hace más de sesenta años hemos ido desarrollando una doctrina propia sobre la capacidad de personas y grupos para demandar a las agen-cias y los funcionarios de gobierno, con una interpretación amplia y liberal de tal concepto. Solis v. Municipio de Ca-guas, 120 D.P.R. 53, 56 (1987); P.S.P. v. E.L.A., 107 D.P.R. 590, 595 (1978).
Recordemos, como señala el profesor Villaronga, que “la doctrina de legitimación, así como otras normas que rigen la justiciabilidad, es un asunto de derecho puertorriqueño”. L.M. Villaronga, Derecho Constitucional, 62 (Núm. 4) Rev. *607 Jur. U.P.R. 683, 684 (1993).(15) Además, el profesor hace el señalamiento siguiente:
En el derecho puertorriqueño, y a riesgo de simplificar ex-cesivamente, coexisten dos vertientes de la doctrina de legiti-mación, las cuales se han desarrollado de forma paralela. Una de ellas, que se asocia con el “familiar modelo de la contienda privada” o “modelo clásico de lo que constituye un ‘caso’ o ‘con-troversia’ ”, postula conceptos restrictivos o de autolimitación en el ejercicio del poder de revisión judicial. Lo otra vertiente, que se asocia con el modelo de “la acción pública”, se aparta de los conceptos de legitimación desarrollados en la jurispruden-cia federal, e interpreta amplia y liberalmente la legitimación activa de ciudadanos individuales. En esta vertiente se en-cuentran casos en que se admite la legitimación por varias razones: se interpreta de manera liberal el estatuto en que se basa la acción, o no se exige al litigante que demuestre un daño particularizado distinto al del resto de la ciudadanía, o se amplía el concepto de lo que constituye daño, o se considera que se trata de acciones revestidas de un vasto interés público. (Énfasis nuestro.) íd., pág. 685.
Por su parte, el Prof. José Julián Alvarez afirma que “[e]n el campo de la justiciabilidad, varias decisiones co-rrectamente se apartan del modelo diseñado para las cor-tes federales y reconocen ‘acciones públicas’, sin exigir al litigante que demuestre un daño particularizado, distinto al del resto de la ciudadanía”. J.J. Alvarez González, La protección de los derechos humanos en Puerto Rico, 57 (Núms. 1-2) Rev. Jur. U.P.R. 133, 169 (1988). Ello no sólo en el contexto de las acciones estatutarias, como serían los casos al amparo de la Ley sobre Política Pública Ambiental que confiere amplia legitimación a los ciudadanos, sino en *608 otros tipos de acciones públicas, al amparo del interés del ciudadano en que se cumpla la política pública del estado.
En estos temas de legitimación de terceros hemos dado acceso a los tribunales mediante la interpretación abarca-dora de las normas de legitimación activa aun cuando la práctica en la jurisdicción federal ha sido lo contrario. En E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983), distin-guimos entre el “modelo de la contienda privada” y las ac-ciones públicas y precisamos el criterio del daño requerido para justificar la legitimación en ambas situaciones. En ese caso, negamos la aplicación del modelo clásico de caso o controversia para resolver asuntos de legitimación en ac-ciones públicas y reconocimos la capacidad de la Telefónica para defender, a nombre de sus clientes, el derecho a la intimidad. Véanse, además: Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715 (1980); Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251 (1979); P.S.P. v. E.L.A., supra.
Por el contrario, quedó resuelto desde Baker v. Carr, 369 U.S. 186 (1962), que la legitimación necesaria para acceder al foro federal, en ausencia de disposición estatu-taria, se reconoce sobre la base del interés personal de la parte en el resultado de la controversia, y en Sierra Club v. Morton, 405 U.S. 121 (1972), el Tribunal Supremo federal sostuvo que una organización sólo podría tener capacidad para demandar si demuestra que algunos de sus miembros se vería afectado por la medida impugnada. Aclaró que aunque se tratara de una “acción pública”, era necesario cumplir con el requisito de que se haya sufrido personal-mente un daño o se tenga un interés personal en el resultado.(16)
Es evidente que esta jurisprudencia federal difiere de la que ha desarrollado este Tribunal a través de los años. Nuestra jurisprudencia ha resuelto claramente que, con *609 relación a legitimación de terceros, incluso en las “contien-das privadas”, una organización no necesariamente tiene que depender de la legitimación de sus miembros para de-mostrar que la organización misma tiene un interés legí-timo que defender en los tribunales. Véanse: Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989); Solís v. Municipio de Caguas, supra. En fin, en Puerto Rico, una organización puede vindicar los derechos propios de la en-tidad si demuestra los daños sufridos por la agrupación. No obstante, cuando la legitimación de la organización se basa en los daños sufridos por sus miembros y la acción se lleva en su representación, entonces, hemos recurrido a la interpretación más restrictiva del foro federal. Véanse: Col. Opticos de P.R. v. Vani Visual Center, supra; Fund. Arqueológica v. Depto. de la Vivienda, supra; Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).(17)
La Fundación Surfrider, Inc. mostró que tiene un inte-rés propio en el resultado de la determinación de la agen-cia, independiente del interés de sus miembros que compa-recieron a las vistas. La Fundación es una organización incorporada al amparo de las leyes del estado de California y debidamente inscrita en el Departamento de Estado. En-tre sus propósitos, delimitados en sus artículos de incorpo-ración, se encuentra la protección de las playas, los océa-nos y sus accesos a través de la conservación, el activismo, la investigación y la educación. Una enmienda a los artí-culos de incorporación añade, además de los propósitos enumerados anteriormente: “Such other purposes as are reasonably related thereto.”(18)
Sabemos que la conservación está íntimamente ligada a la planificación. En este marco, el capítulo de Rincón de la *610 Fundación lleva trabajando activamente desde principios de esta década con asuntos de zonificación y planificación en dicha región relacionados con la creación de la Reserva Marina Tres Palmas. En su página de internet “Salva Tres Palmas”, de la cual se incluyen reproducciones en el expe-diente, la Fundación expresa su interés particular por pre-servar los recursos naturales y recreativos de Rincón, ame-nazados por el desarrollo excesivo del área. Además, la Fundación identificó la necesidad de trabajar para mejorar la zonificación local y la conservación de terrenos en Rincón. Precisamente, éstos son los aspectos que atendió la Fundación, en coalición con otras organizaciones represen-tantes del estilo de “grassroots activism”, para finalmente lograr la designación de la Reserva Marina de Tres Palmas.
Para concluir que la Fundación no tiene legitimación no es suficiente expresar que el proyecto no colinda con el mar o que la Fundación tampoco es vecina del proyecto, es de-cir, que no posee terreno cerca del predio objeto de contro-versia, sin entrar a discutir la jurisprudencia de este Tribunal en la que hemos reconocido legitimación a organizaciones similares. Aunque se entienda que el grado de afectación de la Fundación no es suficiente con relación al caso particular, la Fundación afirmó que sus miembros comparecientes gozan de legitimación individualmente. Realmente, por una u otra razón, no hay base para cerrar las puertas y negar a los peticionarios el acceso a los tribu-nales en este caso.(19) El profesor Álvarez González correc-tamente ha señalado que “[e]l concepto de justiciabilidad ... está íntimamente vinculado a la vindicación de derechos *611 civiles”. Álvarez González, supra, pág. 169 esc. 210. Los derechos constitucionales realmente existen cuando hay el acceso a la justicia; no por el mero hecho de que se hayan plasmado en la constitución de un país, sino porque a tra-vés de los tribunales se asegura al ciudadano el poder vindicarlos.
En la práctica, la vindicación de los derechos ambienta-les no se da solamente invocando la Ley sobre Política Pú-blica Ambiental en el foro judicial. Podría decirse que la mayor parte de las acciones en protección del ambiente se originan en el ámbito administrativo, instadas por indivi-duos, comunidades y organizaciones ambientales para ase-gurar la buena planificación urbana. (20) La razón es evi-dente, pues tanto la política de planificación como la política ambiental reconocen la importancia del equilibrio sustentable entre la actividad humana y los sistemas na-turales en pro del bienestar general. (21) Al interpretar las *612 figuras del interventor y de la parte contenidas en la L.P.A.U., la mayoría inserta en el análisis unos criterios sobre legitimación extremadamente restrictivos, producto de su particular visión interpretativa, lo cual tiene el efecto perjudicial de limitar aún más el acceso a los tribunales. La decisión de la mayoría de este Tribunal desarticula nuestro desarrollo jurisprudencial y niega la legitimación que hemos reconocido a las organizaciones por sus propios daños y a nuestros ciudadanos para llevar acciones públi-cas a nombre propio o de terceros para vindicar una viola-ción de la política pública por parte del mismo gobierno que tiene el deber de tutelarla.
Por otro lado, llamamos la atención a que lo resuelto en el caso ante nuestra consideración forma parte de un desa-rrollo jurisprudencial contrario a la participación ciuda-dana, que se ha ido gestando en las últimas decisiones de este Tribunal. En JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009), la opinión mayoritaria resolvió que una “Comparecencia de Interventores” no puso a la agencia administrativa en posición de aceptarla porque, a su juicio, la petición no estaba debidamente fundamentada como exige la Sección 3.5 de la L.P.A.U., supra. Aduciendo la necesidad de modificar la informalidad del proceso ante las agencias, que supuestamente crea confusión, la mayo-ría en ese caso ignoró la naturaleza flexible de los procedi-mientos administrativos, en particular la Sección 3.5 de la L.P.A.U., que expresamente le requiere a la agencia admi-nistrativa interpretar de forma liberal los requisitos, y por ende las solicitudes, para la intervención. Al criticar la tra-yectoria “liberalizadora” que venía siguiendo este Tribunal, la opinión en JP, Plaza Santa Isabel v. Cordero Badillo, *613 supra, hizo énfasis en que, “[l]a liberalización ... no equi-vale ... a sancionar la intervención indiscriminada ni a sentar el principio de que toda duda posible debe resol-verse a favor de la intervención”. (22) La nueva trayectoria de este Tribunal es sumamente preocupante porque se apuntala en la posición diametralmente opuesta a la tal “liberalización”, que no pretende otra cosa que garantizarle a los ciudadanos, que presenten un interés legítimo, una oportunidad real de participación e intervención.
El presente caso entrelaza, con resultados devastadores, las figuras claves que garantizan el acceso a los tribunales en casos administrativos, o sea, la intervención en el foro administrativo y la revisión judicial. En efecto, el destierro de la figura del “participante activo”, en JP, Plaza Santa Isabel v. Cordero Badillo, supra, sirvió como antesala a la adopción del estándar federal de legitimación que se aplica hoy. Al considerar los nuevos estándares impuestos por este Tribunal, junto a la visión cada vez más estricta de “deferencia sustancial”(23) a la determinación de la agencia administrativa, desembocamos en una claudicación de nuestra función como máximo foro revisor y garante del acceso a los tribunales.
La Opinión en este caso, al igual que en JP, Plaza Santa Isabel v. Cordero Badillo, supra, menosprecia los reclamos de los ciudadanos afectados. Así, ni problemas relacionados al abasto de agua en un vecindario situado en un área turística, ni el efecto económico de un proyecto que impacta la estabilidad del sector, son suficientes para impugnar una cuarta enmienda a un proyecto dudoso o una rezonifi-cación de facto de un predio protegido contra el desarrollo de gran densidad poblacional.
*614 Lo decidido hoy por este Tribunal es un golpe duro a los ciudadanos dedicados a la protección de sus comunidades y comprometidos con el medioambiente, que abogan por un desarrollo urbano ordenado y coherente con nuestra polí-tica pública y sus leyes y reglamentos. Como no coincido con esta decisión y contrario a la mayoría, no decretaría la des-estimación de este recurso, paso a discutir someramente las controversias planteadas en los méritos.
III
El primer señalamiento de error versa sobre la interpre-tación de la Sección 66.01 del Reglamento de Planificación Núm. 4, supra. Al analizarlo debemos recordar, en primer lugar, que este reglamento aplica tanto a la Junta de Pla-nificación como a A.R.Pe. Precisamente, la creación de la Administración de Reglamentos y Permisos respondió a la necesidad de permitir a la Junta dedicarse exclusivamente a desarrollar la política pública de planificación. Hatillo Cash & Carry v. A.R.Pe., 173 D.P.R. 934 (2008); Luán Investment Corp. v. Román, 125 D.P.R. 533, 548 (1990); E.L.A. v. Domínguez, 104 D.P.R. 468, 470 (1975). En vista de ello, hemos resuelto que la intención del legislador, al reestructurar la agencia en 1975, fue trasladar las fases operacionales de la Junta a A.R.Pe. mediante un nuevo esquema administrativo. Hatillo Cash & Carry v. A.R.Pe., supra; A.R.P.E. v. Rivera, 159 D.P.R. 429, 438 (2003).
La Sección 66.01 del Reglamento de Planificación Núm. 4, supra, dispone, como regla general, que la Junta deberá considerar mediante consulta de ubicación los proyectos para las construcciones de casas de apartamentos en los distritos RT-0. No obstante, aunque A.R.Pe. también podrá considerar este tipo de proyecto, sólo podrá ejercer dicha facultad bajo ciertas condiciones restrictivas.(24) El Tribu *615 nal de Apelaciones resolvió que dicha sección del regla-mento solamente excluye la facultad de A.R.Pe. para aten-der los proyectos de casas de apartamentos cuando se trate de desarrollos extensos. Sin embargo, la disposición antes citada expresamente le niega a A.R.Pe. la facultad para aprobar un anteproyecto para el desarrollo de un proyecto de casas de apartamentos en un distrito RT-0, aunque no sea extenso. El tratarse de un desarrollo extenso es sola-mente una de las condiciones que la sección establece para limitarle a A.R.Pe. dicha facultad. Así, en los distritos RT-0, A.R.Pe. no tiene facultad para aprobar un proyecto de casas de apartamentos, sea o no un desarrollo extenso; en los demás distritos tendrá dicha facultad cuando no se trate de desarrollos extensos. No hay duda, pues, que el primer error se cometió. A.R.Pe. simplemente no tiene au-toridad para aprobar proyectos de casas de apartamentos en distritos RT-0.
Los peticionarios alegaron, además, que la concesión de las variaciones solicitadas opera como una rezonificación, facultad que no le fue concedida a A.R.Pe. Adujeron, espe-cíficamente, que las modificaciones a los requisitos de al-tura, densidad poblacional y área bruta de piso, propios del distrito RT-0, cuya intensidad de desarrollo debe ser muy baja, de facto convertirían el predio en un distrito RT-4 de intensidad “semi-alta”.
En López v. Junta Planificación, 80 D.P.R. 646 (1958), discutimos por primera vez la figura de las variaciones. La definición que allí recogimos es cónsona con el concepto plasmado en los reglamentos de la Junta, los cuales se han modificado a través de los años. En particular, resolvimos que “una ‘variación’ permite un uso que es incompatible *616 con el carácter esencial de una zona o distrito a fin de pro-teger en circunstancias extraordinarias los derechos cons-titucionales del propietario”.(25) En cuanto al posible efecto confiscatorio que podría significar la imposición de los re-glamentos de zonificación, hay que recordar que
[e]l hecho de que una zonificación impida el mejor uso produc-tivo o el uso ideal de un terreno, no implica que éste haya sido privado de todo uso ....
... Se olvida muy fácilmente ...de que el uso ideal proyectado por una entidad privada para un terreno no necesariamente está acorde con la política pública establecida por el Estado. (Énfasis nuestro.) Opinión concurrente y disidente del Juez Hernández Denton en Culebra Enterprises Corp. v. E.L. A., 143 D.P.R. 935, 961 y 985 (1997). Véase, también, Arenas Procesadas, Inc. v. E.L.A., 132 D.P.R. 593, 605 y 611 (1993).
Así pues, en Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 80 (2000), resolvimos que no se justifica con-ceder una variación cuando no se haya establecido que nin-guno de los usos permitidos fueran viables y ésta sea inne-cesariamente gravosa.(26) Esto implica que la concesión de variaciones tiene la finalidad de evitar que los reglamentos de planificación se conviertan en un instrumento inflexible, en detrimento de los derechos constitucionales de las personas, y que su aplicación resulte ser irrazonable. Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 769-770 (1987); López v. Junta Planificación, supra, pág. 654. Sin embargo, no se trata de aplicar los requisitos para la con-cesión de variaciones de forma laxa e indiscriminada, puesto que la alteración caso a caso de las características de un distrito que se concibió con cierta infraestructura y para ciertos usos, socava la política pública de planifica-ción urbana integrada. Mun. de San Juan v. Bosque Real, *617 S.E., 158 D.P.R. 743, 763 (2003); Asoc. Res. Park Side, Inc. v. J.P., 149 D.P.R. 300, 308 (1999). Cualquiera que sea la variación, “la densidad o intensidad solicitada” no debe im-plicar una rezonificación de facto, es decir, “convertir el distrito en otro”. Subsección 82.05 del Reglamento Núm. 6211 de 4 de noviembre de 2000, pág. 287. Véase Sec. 2.00(32) del Reglamento Núm. 6435 de la Administración de Reglamento y Permisos, 19 abril de 2002, pág. 19.(27)
En cuanto a esto, el tratadista E.C. Yokley explica que una variación sirve para permitir desviaciones mínimas a las reglamentaciones del uso de los terrenos para evitar perjuicios innecesariamente gravosos al propietario sin menoscabar el esquema global de la reglamentación.(28) E.C. Yokley, Zoning Law and Practice, 4ta ed., Charlottesville, Michie Co., Vol. 1, 2008, Sec. 20-1, págs. 20-1 y 20-2. Así lo resolvimos en Mun. de San Juan v. Bosque Real, S.E., supra, frente a una solicitud de variación a los requi-sitos de densidad poblacional.
De forma consecuente, hemos resuelto que si lo que se solicita conlleva un cambio en la zonificación del predio deben cumplirse los requisitos aplicables a una rezonifica-ción, los cuales hemos explicado en varias ocasiones. Véanse: Mun. de San Juan v. Bosque Real, S.E., supra, pág. 766; López v. Antonio Roig Sucrs. Inc., 157 D.P.R. 186, 198 (2002); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 88 (1999); Montoto v. Lorie, 145 D.P.R. 30, 46 *618 (1998).(29) Igualmente consecuentes hemos sido en cuanto a que el “poder de reglamentación sobre zonificación ... in-cluye la rezonificación”. Luan Investment Corp. v. Román, supra, pág. 549.(30)
En Montoto v. Lorie, supra, explicamos la figura de la rezonificación y expresamos lo siguiente:
Nuestra realidad social obliga al Estado a salvaguardar las zonificaciones existentes. Para lograr enmendar y alterar és-tas, es necesario que el propósito de la zonificación original del área sea incompatible con el ambiente prevaleciente. De en-tender la Junta que las circunstancias del área donde ubica el solar que habrá de ser rezonificado han cambiado con el tiempo, ésta puede optar por permitir la enmienda en el mapa de zonificación. De no ser así, la Junta debe mantener la zo-nificación original. Íd., págs. 43-44.
Por su parte, la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 1 de julio de 1975 (23 L.P.R.A. sec. 71 et seq.), permite conceder varia-ciones o autorizar excepciones a los requisitos de zonifica-ción establecidos por los reglamentos que administra, su-jeto a los mismos criterios que dispone la ley para el ejercicio de esta facultad por la Junta y a las normas adop-tadas por la Junta mediante reglamento. En fin, ambas agencias tienen la facultad de dispensar del cumplimiento de los requerimientos propios de los distritos de zonifica- *619 ción, mediante disposiciones separadas y con un lenguaje muy similar. (31)
Sin embargo, la discreción de A.R.Pe. para otorgar va-riaciones está limitada a los casos especificados en los re-glamentos adoptados por la Junta. En lo que respecta a las normas de zonificación, el propósito de permitir la conce-sión de variaciones, según el Reglamento de Zonificación, es “evitar que la aplicación literal de los requerimientos de este Reglamento resultare en una confiscación del disfrute de la propiedad”. Subsecciones 82.02 y 83.02 del Regla-mento de Planificación Núm. 4, supra, págs. 286 y 288. Cuando se demuestre, a satisfacción de la agencia, que la propiedad está particularmente afectada por la reglamen-tación y resulte “innecesariamente gravosa”, la Subsección 82.05 del Reglamento de Planificación Núm. 4, supra, es-tablece los parámetros para guiar la discreción de ambas agencias en la aplicación de los mecanismos de variación, íd., págs. 287 — 288.(32) Véanse: Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254 (2007); Mun. de San Juan v. Bosque Real, *620 S.E., supra, pág. 761; A.R.P.E. v. J.A.C.L., 124 D.P.R. 858, 864 (1989). En esa subsección, se dispone que se deberán tomar en consideración los factores siguientes:
4. La densidad o intensidad solicitada no lleva a convertir el distrito en otro.
5. La variación solicitada es cónsona con los propósitos de la disposición reglamentaria que se solicita sea modificada, así como con la política pública. (Enfasis suplido.) Subsección 82.05 del Reglamento de Planificación Núm. 4, supra, págs. 287-288.
Evidentemente, la concesión de las variaciones solicita-das por el proponente constituye una rezonificación de facto. La Sección 33.02 permite la construcción de edificios de casas individuales y casas de dos unidades de vivienda en los distritos RT-0.(33) Además, las Secciones 33.03 y 66.02 del Reglamento de Planificación Núm. 4 aclara que en los distritos RT-0, la altura no deberá exceder de nueve metros. Por otro lado, la Sección 38.03 dispone que “[l]os edificios para uso residencial [en distritos RT-4] podrán te-ner hasta cuatro (4) plantas de altura”. En este caso, se solicitó una variación de dos plantas y 1.36 metros, lo cual conformaría las estructuras a los requerimientos de altura del distrito RT-4.
De la misma manera, en cuanto a la densidad poblacio-nal permitida para las construcciones de casas de aparta-mentos en distritos RT-0, la Sección 66.03 dispone que en solares cuya área sea mayor de 2000 metros cuadrados, la densidad debe ser de 700 metros cuadrados por unidad de vivienda. La variación solicitada pedía desarrollar el pre- *621 dio para aumentar la densidad poblacional a 147 metros cuadrados por unidad de vivienda. Esto es equivalente a lo permitido para los distritos RT-3.(34)
En cuanto al área bruta de piso, la Sección 66.05 del Reglamento Núm. 4 permite ocupar un máximo de 40% del área del solar en aquellos solares mayores de 2000 metros cuadrados en los distritos RT-0. La variación solicitada buscaba aumentar el área bruta a un 98.49%, equivalente a lo permitido en los distritos RT-3. La Sección 37.07 del Reglamento establece que en los distritos RT-3, el área bruta “no excederá el cien por ciento (100%) del área del solar”. Id., pág. 164.
Por otro lado, la Resolución Núm. 2000-011-JP-ZIT, emi-tida por la Junta el 16 de enero de 2001, adoptó para los municipios de Rincón y Añasco, la delimitación y designa-ción de ciertas áreas como zonas de interés turístico.(35) El propósito de la designación de una zona de interés turístico es identificar un área que debe ordenarse de tal manera que se fomente el desarrollo del turismo y se proteja el valor particular del lugar. Esta Resolución adoptó, además, los mapas de zona de interés turístico correspondientes a dichos municipios. De esta manera, la finca en controver-sia se ubicó en un distrito RT-0, cuyo propósito es
... promover el desarrollo ordenado y estético y para clasificar terrenos en las Zonas de Interés Turístico, normalmente en la periferia de áreas desarrolladas o con algunas limitaciones a su utilización, que se han desarrollado o podrían desarrollarse a una muy baja intensidad. (Enfasis suplido.) Subsección *622 33.01 del Reglamento de Planificación Núm. 4, supra, pág. 152.(36)
Por su parte, los distritos RT-3 se ubican en una zona de interés turístico y podrán desarrollarse a una intensidad intermedia.(37) En lo pertinente, los usos residenciales per-mitidos serán las casas en hilera y casas patio.(38) A su vez, los distritos RT-4 también se ubican en una zona de interés turístico, pero su desarrollo deberá darse a una intensidad “semi-alta” y sus usos residenciales deben darse “en edifi-cios para casas individuales, casas de dos (2) unidades de vivienda y casa de apartamientos de acuerdo a lo estable-cido en esta Sección”. (Énfasis nuestro.) Subsección 38.01 y 38.02(4) del Reglamento de Planificación Núm. 4, supra, pág. 166.
El Reglamento de Planificación Núm. 4 claramente dis-pone que las variaciones no pueden afectar las caracterís-ticas de un distrito y convertirlo en otro.(39) Cuando lo so-licitado es a todas luces una rezonificación no podemos servirnos de tecnicismos para permitirlo, puesto que haría-mos inoperante tanto la ley habilitadora que no le delega a A.R.Pe. dicha facultad de zonificar y el Reglamento, que no le permite cambiar el distrito.
Por último, los peticionarios señalaron que los propo-nentes no fundamentaron su solicitud de variación y que por esta razón también A.R.Pe. no debió conceder las variaciones. Alegan que el Tribunal de Apelaciones erró al confirmar la determinación de A.R.Pe., puesto que la agen-cia no consideró los factores para la concesión de las varia-ciones solicitadas conforme a derecho.
*623 Los reglamentos y la jurisprudencia exigen que se de-muestre que la aplicación literal de las disposiciones regla-mentarias a un predio particular constituye una confisca-ción del disfrute de dicha propiedad. Hemos resuelto que por la naturaleza del interés público, esto es necesario para salvaguardar el esquema global de planificación. Para que se conceda una variación, el proponente debe de-mostrar que en su caso particular, el reglamento resulta en una prohibición o restricción irrazonable e innecesaria-mente gravosa sobre la propiedad, pero para ello no es su-ficiente que se impida lo que el propietario entienda que es el uso óptimo o ideal de los terrenos. El proponente sostuvo su solicitud de variación en la existencia de “presión de desarrollo en el área y el alto costo de estos terrenos [que] no permite maximiz ación edificando una estructura residencial”.(40) No estamos pasando juicio sobre la situa-ción que plantea el proponente, pero, aunque ésta pueda ser una consideración para que la Junta autorice rezonifi-car, no es pertinente para la evaluación de una variación. Estas razones no establecen un menoscabo confiscatorio al derecho de disfrute de la propiedad privada.
IV
Por todo lo anterior, resolvería, contrario a la Opinión del Tribunal, que los peticionarios tienen legitimación ac-tiva para solicitar la revisión judicial de la resolución de A.R.Pe. en este caso. Además, considerados los méritos de la controversia, revocaría la sentencia del Tribunal de Ape-laciones y resolvería que A.R.Pe. carece de jurisdicción para entender en el proyecto en controversia, toda vez que la Sección 66.01 del Reglamento de Planificación Núm. 4 lo prohíbe y porque las variaciones solicitadas realmente per-siguen rezonificar el predio.

 El colindante derecho también ubica en un distrito RT-0, mientras que el colindante izquierdo, delantero y posterior están calificados como “público”. El ante-proyecto sometido ante Administración de Reglamentos y Permisos (A.R.Pe.) tam-bién solicitaba una variación al requisito de la Sección 66.09 del Reglamento de Planificación Núm. 4, según enmendado por el Reglamento Núm. 6211 de 5 de no-viembre de 2000, sobre la separación entre el edificio y los estacionamientos de casas de apartamentos, particularmente, variar la distancia de un mínimo de tres metros a 1.2 metros. No obstante, esto no surge del memorial explicativo de 1 de julio de 2004 ni de la autorización de A.R.Pe. del 13 de enero de 2005.

 El Reglamento de Planificación Núm. 4 utiliza el concepto de una unidad de vivienda básica en el contexto de las casas de apartamentos “para obtener un nuevo cálculo para la densidad permitida en un solar a base del número de habitaciones de cada unidad de vivienda. Una unidad de vivienda básica se compone de una vivienda de tres (3) dormitorios”. Sec. 2.00 del Reglamento Núm. 6211 de 5 de noviembre de 2000, pág. 24. Por esta razón, la Sección 66.03 del Reglamento dispone que un apar-tamento de dos habitaciones equivale a 0.8 unidad de vivienda y que la densidad poblacional no debe exceder de 700 metros cuadrados por unidad de vivienda. íd., págs. 238-239. Por lo tanto, en el caso ante nuestra consideración, el proyecto pro-pone ubicar 19.2 unidades de vivienda básica (24 apartamentos de 0.8 unidades) cuando el reglamento permite solamente cuatro unidades de vivienda en un solar de 2791.712 metros cuadrados.

 Apéndice, pág. 62.

 Oposición a petición de certiorari, pág. 2.

 Íd., pág. 3.

 Informe Conjunto de las Comisiones de Gobierno Estatal, Asuntos Municipales de lo Jurídico sobre el P. del S. 350, 9 de abril de 1987; Pagán Ramos v. FS.E., 129 D.P.R. 888, 898 (1992).

 Sin embargo, cuando la interpretación del tribunal del estado sea posterior a la adopción del estatuto en Puerto Rico, aquélla sólo tendrá valor persuasivo en nuestra jurisdicción. Pueblo v. Cirino, 69 D.P.R. 525, 529 (1949).

 En El Pueblo v. Rivera (a) Panchito, 7 D.P.R. 332 (1904) el Juez Asociado MacLeary señaló que “[e]s un principio bien establecido, tanto en la ley [a]mericana como en la [e]spañola que cuando un Estado adopta una ley de otro, la interpretación que los tribunales de este último estado hayan dado á [sic] dicha ley merece gran consideración en la interpretación ... presumiéndose que la Legislatura al adoptar el texto de la citada ley tenía la intención de que hahía de darse tal interpretación. ... Nosotros estamos ciertamente autorizados para seguir las numerosas y altamente respetables autoridades citadas en la presente, especialmente cuando el razona-miento es tan sano y convincente ...”. Id., pág. 353. Cabe señalar que la referencia a la “ley española” no sólo es equivocada, sino contraria a los principios sobre las fuentes de derecho del Derecho Civil.

 Sabemos que recurrir a las soluciones jurídicas adoptadas por otras jurisdic-ciones puede ser necesario y que muchas veces enriquece nuestro Derecho, sobre todo cuando nuestro ordenamiento no propone una solución adecuada a una contro-versia o sufre de alguna laguna jurídica. Véase, por ejemplo, Dávila v. Agrait, 116 D.P.R. 549 (1985). Sin embargo, cuando ese no es el caso, el trasplante de conceptos jurídicos puede ser más bien una fuente de confusión y discordia. Lo mismo es cierto cuando se toma prestada toda una normativa de otra jurisdicción por la sola razón de que es el lugar de origen de la figura que debe interpretarse, ya que con ello se prescinde de un proceso continuo de adaptación e interpretación a la luz del derecho receptor. Por ende, si el préstamo jurídico, sea sustantivo o procesal, no se funda-menta en la ponderación de los méritos de la acción judicial y de su proyección en el futuro, éste puede tener un efecto perjudicial en nuestro ordenamiento jurídico y, por lo tanto, en la sana administración de la justicia. Véase L. Fiol Matta, Interacción del derecho común anglo-americano (“common law") y el derecho civil, 57 Rev. Col. Abog. 171, 178-179 (1996): “[C]uando se adopta una figura jurídica y se pretende adoptar, además, la interpretación que a éste se da en el sistema originario-como sucedió en Puerto Rico con la nefasta teoría de que un estatuto se adopta con la interpretación brindada en su lugar de origen-se subvierte el orden formal de las fuentes y se sustituyen los métodos de interpretación propios del sistema.”

 “Today, more than half of the states have an administrative procedure act based, at least in part, on either the original Model Act or its 1961 revision .... In the last twenty years there has also been a great deal of experience with the provisions of the Model Act as enacted in the several states, and also a great deal of state legislative experimentation with additional or different administrative procedure requirements." (Enfasis nuestro.) Model State Administrative Procedure Act, 1981 Act (U.L.A.), Prefatory Note, pág. 2.

 A saber, se desprende de una somera lectura que ambas leyes emplean, con ciertas variaciones menores, la organización estructural siguiente: (a) Disposiciones Generales, (b) Procedimiento para la Reglamentación, (c) Procedimientos Adjudica-tivos, y (d) Revisión Judicial.

 La disposición modelo reza: “The presiding officer shall grant a petition for intervention if ... the petition states facts demonstrating that the petitioner’s legal rights, duties, privileges, immunities, or other legal interests may be substantially affected by the proceeding ....” (Énfasis nuestro.) Model State Administrative Procedures Act, 1981 Act (U.L.A.) Sec. 4-209(a)(2), pág. 87.
Sin embargo, la disposición análoga en nuestra L.P.A.U. dispone, como requisito para solicitar la intervención, que sea “[c]ualquier persona que tenga un interés legítimo en un procedimiento adjudicativo ante una agencia (Énfasis nuestro.) Sec. 3.5 de la L.P.A.U., 3 L.P.R.A. sec. 2155. Esta diferencia en el grado de afectación se ve aún más marcada cuando la misma disposición desglosa siete factores que tomará en consideración la agencia para considerar si deniega o concede la intervención. Entre éstos se encuentra: “(a) Que el interés del peticionario pueda ser afectado adversamente por el procedimiento adjudicativo.” (Énfasis nuestro.) Id. Pos-teriormente en la misma disposición se da como directriz: “La agencia deberá aplicar los criterios que anteceden de forma liberal y podrá requerir que se le someta eviden-cia adicional para poder emitir la determinación correspondiente con respecto a la solicitud de intervención.” (Énfasis nuestro.) Id.

 Véanse, como ejemplo, las decisiones del Tribunal Supremo federal en Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), Lujan v. National Wildlife Federation, 497 U.S. 871 (1990), United States v. SCRAP, 412 U.S. 669 (1973), y Sierra Club v. Morton, 405 U.S. 727 (1972).

 Por eso, la interpretación de esta ley federal puede ser persuasiva al mo-mento de interpretar la nuestra, pero no debemos recurrir indiscriminadamente a la jurisprudencia que la interpreta, ya que no todas las disposiciones de nuestro esta-tuto parten de los mismos principios. Por ejemplo, la declaración de política pública contenida en nuestra ley no es meramente estatutaria, sino de rango constitucional. Véase Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1. Por la naturaleza constitu- *605 cional del mandato de protección de nuestros recursos naturales, la Asamblea Legis-lativa, con el objetivo de establecer unas pautas para guiar la implantación de la Sección 19, aprobó nuestra primera Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 et seq.). Véanse: Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 277 (1999); Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 920 (1998); Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723 (1974).

 L.M. Villaronga, Derecho Constitucional, 62 (Núm. 4) Rev. Jur. U.P.R. 683, 684 (1993): “Así como en el derecho federal, nuestros requisitos de justiciabilidad y de legitimación surgen de las preocupaciones institucionales inherentes al poder judicial de Puerto Rico y al papel que desempeña en nuestro sistema de gobierno. Las decisiones federales, aunque proveen guías útiles a las que nuestro Tribunal Supremo frecuentemente se refiere, en última instancia son impertinentes para resolver la cuestión de cuán liberales deben ser las normas de legitimación de un estado cuando determina ser generoso.”

 “But broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.” Sierra Club v. Morton, supra, pág. 738.

 Vale señalar el efecto que puede tener en otros tipos de casos la interpreta-ción que hoy adopta la mayoría. Por ejemplo, la legitimación reconocida a los legis-ladores en nuestra jurisdicción en ocasiones es más amplia que en el foro federal. Véanse: Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982); Fuster v. Busó, 102 D.P.R. 327 (1974), entre otros.

 Apéndice, pág. 8.

 En E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983), advertimos lo si-guiente: "... tendemos a veces olvidar que, a fin de cuentas, la doctrina de capacidad para demandar [o legitimación activa] es tan s[ó]lo un mecanismo que los tribunales utilizan en ocasiones para delimitar su propia jurisdicción, para no adentrarse en los dominios de otras ramas del gobierno, para no lanzarse a resolver cuestiones hipo-téticas o planteadas dentro de un contexto inadecuado de hechos .... Hay que ir, para sopesarlas a plena luz, a las fuerzas subyacentes que motivan en la realidad la abstención o intervención judicial en una situación dada.”

 Recordemos además nuestras decisiones en Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.RR. 70 (2000), y Asoc. Res. Park Side, Inc. v. J.P., 149 D.P.R. 300 (1999), en las cuales elaboramos el concepto de ambiente humano o urbano.

 La declaración de la Ley sobre Política Pública Ambiental dispone lo si-guiente:
“El Estado Libre Asociado de Puerto Rico, en pleno reconocimiento del profundo impacto de la actividad del hombre en las interrelaciones de todos los componentes del medio ambiente natural, especialmente las profundas influencias del crecimiento poblacional, la alta densidad de la urbanización, la expansión industrial, recursos de explotación y los nuevos y difundidos adelantos tecnológicos y reconociendo, además, la importancia crítica de restaurar y mantener la calidad medio ambiental para el total bienestar y desarrollo del hombre, declara que es política continua del Gobierno del Estado Libre Asociado, incluyendo sus municipios, en cooperación con las orga-nizaciones públicas y privadas interesadas, el utilizar todos los medios y medidas prácticas, incluyendo ayuda técnica y financiera, con el propósito de alentar y pro-mover el bienestar general y asegurar que los sistemas naturales estén saludables y tengan la capacidad de sostener la vida en todas sus formas, así como la actividad social y económica, en el marco de una cultura de sustentabilidad, para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas y cuales-quiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños.” (Enfasis suplido.) 12 L.P.R.A. sec. 8001(a). La Ley Orgánica de la Junta de Planificación, por su parte, al establecer los propósitos de dicha agencia, dispone lo siguiente:
“Los poderes concedidos en este subcapítulo se ejercerán con el propósito general de guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado, económico, el cual, de acuerdo con las actuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos, hubiere de fomentar en la me- *612 jor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros ha-bitantes, y aquella eficiencia, economía y bienestar social en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente.” (Énfasis nuestro.) Art. 4 de la Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. sec. 62c).

 JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009), citando a Chase Manhattan Bank v. Nesglo, Inc., 111 D.P.R. 767, 770 (1981).

 Con relación a la norma de deferencia sustancial, notamos la pérdida u omisión en los casos recientes de una expresión de contrapeso: “cuando la agencia interpreta el estatuto que viene llamado a poner en vigor de forma tal que produce resultados contrarios al propósito de la ley, dicha interpretación no puede prevalecer.” Martínez v. Rosado, 165 D.P.R. 582, 590 (2005).

 En particular, la Subsección 66.01 establece lo siguiente:
*615 “La Junta considerará, mediante consulta de ubicación en los distritos RT-0, RT-00, RT-1, R-3 y R-4 proyectos para las construcciones que más adelante se indican. La Administración de Reglamentos y Permisos podrá considerar estas cons-trucciones siempre que el proyecto no ubique en un distrito R-0, R-l, R-2, RT-00, RT-0, RT-1, RT-2 y no constituya un desarrollo residencial extenso y sujeto a las condicio-nes necesarias para asegurar su armonía con el contexto en que ubique.” (Énfasis nuestro.) Reglamento de Planificación Núm. 4, supra, pág. 238.

 López v. Junta Planificación, 80 D.P.R. 646, 654 (1958).

 Véanse: Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 761 (2003); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 82-83 (1999); Asoc. Res. Park Side, Inc. v. J.P., 139 D.P.R. 349, 356 (1995); Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 769 (1987).

 Véase K.H. Young, Anderson’s American Law of Zoning, 4ta ed., Nueva York, Clark Boardmand Callaghan, 1996, Vol. 3, Sec. 20.06, pág. 425: “A ‘use’ of variance, as the term implies, is one which permits a use of land other than those is [sic] prescribed by the zoning regulations. Thus, a variance which permits ... a multiple dwelling in a district limited to single-family homes ... is a use variance.” Véase, además, la discusión de la jurisprudencia de distintos estados en E.C. Yokley, Zoning Law and Practice, 4ta ed., Charlottesville, Michie Co., Vol. 1, 2008, págs. 20-9 y 20-10.

 “It [a variance] has been described as an administrative or quasi-judicial act permitting minor deviations from land use regulations and avoiding undue hardship for the property owner without violating the overall scheme of land use regulation. It is not a reclassification of the zoning applicable to a property.” Yokley, op. cit., Sec. 20-1, págs. 1-2.

 Tanto el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 de 13 de octubre de 1999, vigente al momento de los hechos, como el nuevo Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 7629 de 11 de diciembre de 2008, disponen que cuando una consulta de ubicación conlleve alguna variación, se deberá someter, junto a la consulta, una solicitud de variación y se deberán fundamentar las razones que apoyan la solicitud. Igualmente se aplica cuando lo solicitado es una excepción. Véanse: la Subsección 4.01 del Reglamento Núm. 6031, supra, págs. 18-19; Regla-mento Núm. 7629, supra, págs. 8-9. Además, la Subsección 4.09 establece los requi-sitos cuando los cambios de zonificación se solicitan mediante una consulta de ubicación. Reglamento Núm. 6211, supra, pág. 50. Véase Subsección 4.11 del Reglamento de Calificación, Reglamento Núm. 7628 de 11 de diciembre de 2008, pág. 36.

 Véanse: J.P. v. Frente Unido I, 165 D.P.R. 445, 464 (2005); T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 83.

 El Artículo 11(7) de la Ley Orgánica de la Junta de Planificación de Puerto Rico permite:
“Dispensar el cumplimiento de uno o varios requisitos reglamentarios con el propósito de lograr la utilización óptima de los terrenos y dirigido hacia el objetivo de poner en práctica el desarrollo urbano compacto; o en los casos en que un uso no permitido, pero compatible con el carácter esencial del distrito, la aplicación de los requisitos de los reglamentos resulte en la prohibición o restricción irrazonable del disfrute de una pertenencia o propiedad y se le demuestre, a su satisfacción, que dicha dispensa aliviará un perjuicio claramente demostrable, pudiendo imponer las condi-ciones que el caso amerite para beneficio o protección del interés público.” (Énfasis nuestro.) 23 L.P.R.A. sec. 62j(7).
Por su parte, la Ley Orgánica de la Administración de Reglamentos y Permisos dispone que serán deberes y facultades generales del Administrador y de la Admi-nistración, además de las que le son conferidas por este capítulo, o por otras leyes, los siguientes:
“(u) Dispensar el cumplimiento de los requisitos de los Reglamentos de Planifi-cación de conformidad con lo establecido en los mismos y en este capítulo, asegu-rando siempre que dicha facultad no se utilice con el propósito o resultado de obviar las disposiciones reglamentarias vigentes.” (Énfasis nuestro.) 23 L.P.R.A. sec. 7Id.

 Aunque la Subsección 82.05 dispone que solamente la Junta podrá conceder variaciones, se entiende que A.R.Pe. también puede, puesto que su ley orgánica le faculta para ello. Véase 23 L.P.R.A. sec. 71i. La Resolución Núm. JPD-11-2002 de la Junta de Planificación, además, delega en A.R.Pe. la facultad de adjudicar solicitu-des de variaciones en el Reglamento de Planificación Núm. 4, reconociendo que está dentro de su ámbito de jurisdicción otorgado por ley.

 El Reglamento de Planificación Núm. 4 define el concepto de “unidad de vivienda” de la manera siguiente: “Edificio o aquella parte del mismo que se utiliza para el alojamiento de una familia”. Sección 2.00 del Reglamento Núm. 6211, supra, pág. 24. A su vez, define “casa de dos familias” y permite que se den “una sobre la otra”. Id., pág. 9. Ya que la Sección 33.00, referente al distrito RT-0, no utiliza un concepto específico para describir el tipo de edificio que se pueda construir para alojar a dos familias, podemos concluir que la altura máxima de plantas en un dis-trito RT-0 es de dos plantas.

 Así lo dispone la Sección 37.05 del Reglamento: “En proyectos de casas de dos familias y casas de apartamentos se permitirá una densidad de ciento cincuenta (150) metros cuadrados por unidad de vivienda básica.” Reglamento de Planificación Núm. 4, supra, pág. 163.

 En dicha resolución, la Junta expuso que en “la Región Oeste esta Zona de Interés Turístico responde a la política pública del Gobierno de Puerto Rico para desarrollar la Región como un polo turístico de importancia nacional e internacional, dándole énfasis a la preservación de recursos naturales, únicos en la Isla y el Caribe, promoviendo así el desarrollo económico e integral de esta Región”. Apéndice, pág. 22.

 Los usos permitidos para dicho distrito se enumeran en la Subsección 33.02. En lo pertinente, el reglamento dispone que se permitirán “[u]sos residenciales en edificios de casas individuales y casas de dos (2) unidades de vivienda”. Subsección 33.02(3) del Reglamento de Planificación Núm. 4, supra, pág. 152.

 Subsección 37.01 del Reglamento de Planificación Núm. 4, supra, pág. 162.

 Subsección 37.02(4) del Reglamento de Planificación Núm. 4, supra, pág. 163.

 Sec. 82.05 del Reglamento de Planificación Núm. 4, 6211, supra.

 Oposición a Petición de certiorari, pág. 14.